**KANSAS HOSPITAL ASSOCIATION, Bethany Medical Center, Asbury–Salina Regional Medical Center, and Stormont–Vail Regional Medical Center,**

and

**Inez Williams, Vanessa Brewer, and Gary Byers, individually and on behalf of all similarly situated persons, Plaintiffs,**

v.

**Donna L. WHITEMAN, in her official capacity as Secretary of the Kansas Department of Social and Rehabilitation Services, Donna Shalala, in her official capacity as Secretary of The United States Department of Health and Human Services, and Bruce C. Vladeck, in his official capacity as Administrator of the Health Care Financing Administration, Defendants.**

Civ. A. No. 93–4217–DES.

United States District Court, D. Kansas.

Nov. 3, 1993.

Charles R. Hay, Wayne T. Stratton, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Kansas Hosp. Ass'n, Bethany Medical Center, Asbury–Salina Regional Medical Center, Inc. and Stormont–Vail Regional Medical Center.

Carol L. Boorady, Jane K. Swanson, Kansas Legal Services, Inc., Kansas City, KS, for Inez Williams, Vanessa L. Brewer and Gary Byers.

Reid Stacey, Social & Rehabilitation Services, Topeka, KS, Vickie J. Larson, S. William Livingston, Jr., Covington & Burling, Washington, DC, Bruce A. Roby, Kansas Dept. of SRS, Topeka, KS, for Social and Rehabilitative Services.

Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, for Health and Human Services of U.S.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on the motion of the plaintiffs for a preliminary injunction (Doc. 2). On October 4, 1993, this court issued a temporary restraining order in favor of the plaintiffs to preserve the status quo until such time as the court had the opportunity to consider the plaintiff's motion for preliminary injunction and defendant Whiteman's written response. A hearing was held on the motion on October 25, 1993, at which time the parties presented oral argument and agreed to submit additional evidence for the court's consideration, in the form of deposition transcripts, exhibits, and affidavits, by October 26, 1993. The court has reviewed and considered the motion, the plaintiffs' memoranda in support, the response filed on behalf of defendant Donna Whiteman, the evidence submitted by the parties on October 26, 1993, and the arguments presented at the hearings. The court is now prepared to rule on the motion for a preliminary injunction.

#### The Parties

This case is brought by two groups of plaintiffs. The first group ("hospital plaintiffs") includes the Kansas Hospital Association, a non-profit corporation representing the views of 126 of the 131 community hospitals in Kansas; Bethany Medical Center, located in Kansas City, Kansas; Asbury–Salina Regional Medical Center, located in Salina, Kansas; and Stormont–Vail Regional Medical Center, located in Topeka, Kansas. The three plaintiff hospitals are all licensed general hospitals. As participating providers in the Kansas Medicaid Plan,[1] each of the three hospitals regularly admits Medicaid beneficiaries as patients.

1. Medicaid is a program of medical assistance funded in part by the federal government and in

**1560**

The second group of plaintiffs ("individual plaintiffs") includes Inez Williams and Vanessa Brewer, both residents of Kansas who are eligible for and receive Medicaid benefits, and Gary Byers, a Kansas resident who is eligible for and receives benefits under the Kansas MediKan program.[2] All have chronic health problems that are reasonably likely to require hospital treatment within the next year. None of the three individuals have any other medical insurance coverage. The individual plaintiffs seek to represent a class, not as yet certified, comprising all present and future recipients of medical assistance benefits provided by the state Department of Social and Rehabilitation Services who are, or will be, affected by the challenged action.

Defendant Donna Whiteman is the chief executive officer of the state Department of Social and Rehabilitation Services, the agency that administers the Kansas Medicaid Plan. When this case was initially filed, she was the only defendant named in the complaint. However, on October 14, 1993, the individual plaintiffs filed an amended complaint adding as defendants Donna E. Shalala, Secretary of Health and Human Services, and Bruce C. Vladeck, Administrator of the Health Care Financing Administration (hereinafter "federal defendants"). The plaintiffs' amended complaint requests preliminary injunctive relief, however, only against defendant Whiteman. While the federal defendants were represented at the hearing on the preliminary injunction, they did not participate in arguments and have not filed any pleadings to date in this litigation.[3]

*Nature of the Claim*

Plaintiffs collectively seek to bar implementation of an impending amendment to K.A.R. 30–5–71(a)(1), a regulation promulgated by defendant Donna Whiteman in her official capacity as Secretary of the Kansas Department of Social and Rehabilitation Services.[4] Defendant Whiteman is delegated the responsibility under Kansas statutes for administering medical assistance programs in Kansas, including Medicaid. *See* K.S.A.1992 Supp. 39–708c(s). States electing to participate in the Federal Medicaid program are permitted, but not required, by federal statutes to charge certain Medicaid recipients copayments for specific services. *See* 42 U.S.C. § 1396o(a)(3), (b)(3), *see also Sweeney v. Bane,* 996 F.2d 1384, 1385 (2d Cir.1993). The proposed state regulatory amendment, previously scheduled to take effect October 1, 1993,[5] would increase the copayment charged to medical assistance beneficiaries for inpatient hospital services from the present level of $25 for each hospital admission to $325 per admission.

---

part by the state for aged, blind, or disabled individuals, and for families with dependent children, whose income and resources are insufficient to meet the costs of necessary medical services. Medicaid is authorized by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* While state participation is voluntary, any state electing to participate must comply with statutory requirements pertaining to the program. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990).

2. MediKan is the state-funded medical assistance program for beneficiaries of the state welfare program known as General Assistance. At oral argument on the motion for a temporary restraining order, counsel for the individual plaintiffs conceded that the federal requirements and restrictions applicable to the Medicaid program do not apply to plaintiff Byers, since MediKan is a state-funded program. Nevertheless, counsel stated that the challenged action taken by defendant Whiteman applies to MediKan beneficiaries as well as to Medicaid beneficiaries.

3. The claims against the federal defendants are brought only by the individual plaintiffs, and not the hospital plaintiffs. The individual plaintiffs seek relief in the form of a declaratory judgment against the federal defendants, specifically a finding that 42 C.F.R. § 447.54 is inconsistent with its authorizing statute, 42 U.S.C. § 1396o. *See* discussion *infra* pp. 1567–70.

4. Because plaintiffs seek no monetary relief, this suit is properly brought against defendant Donna Whiteman in her official capacity. *See AMISUB (PSL) v. State of Colorado, Dep't of Social Services,* 879 F.2d 789, 793 n. 7 (10th Cir.1989) (citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

5. Although the defendant originally proposed the amendment to take effect September 1, 1993, she was unable to obtain the necessary approval of the State Rules and Regulations Board in order to implement the change as a temporary regulation prior to October 1, 1993. The temporary restraining order granted by this court has further delayed the effective date of the amendment.

## Jurisdiction and Venue

■ The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2), inasmuch as the plaintiffs contend that the defendants' actions do not comply with federal law.[6] Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(3).

## Legal Basis for the Relief Claimed

The plaintiffs seek injunctive and declaratory relief barring defendant Donna Whiteman from implementing the proposed regulation, claiming that the amendment would violate certain rights afforded to some or all of them by federal statutes and regulations. The individual plaintiffs seek equitable remedies for the alleged violations pursuant to 42 U.S.C. § 1383 [7] and 42 U.S.C. § 12101 *et seq.* (the Americans With Disabilities Act), including a preliminary injunction to bar the proposed amendment from taking effect during the pendency of this litigation. The hospital plaintiffs seek the same declaratory and injunctive relief, apparently relying on 42 U.S.C. § 1983, or in the alternative an implied cause of action pursuant to *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[8]

## Preliminary Injunction Standards

■ Whether or not to grant preliminary injunctive relief is within the sound discretion

6. Plaintiffs' complaint also alleges the court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343, which provides that federal district courts have jurisdiction over certain civil rights actions. The court does not consider that statute applicable to this case. The plaintiffs do not seek recovery of damages, do not allege violation of federal laws protecting equal rights of all citizens or all persons within the jurisdiction of the United States, and do not seek relief under any federal statute providing for the protection of civil rights such as the right to vote. *See* 28 U.S.C. § 1343(a)(1)–(4). Rather, the plaintiffs seek to enforce statutory and regulatory conditions that they contend apply to a voluntary program of federal medical assistance to states.

7. Public aid recipients, the individuals most directly affected by administration of public aid programs, may institute actions under 42 U.S.C. § 1983 to secure compliance with the provisions of the Social Security Act by participating states. *See Edelman v. Jordan,* 415 U.S. 651, 675, 677, 94 S.Ct. 1347, 1362, 1362, 39 L.Ed.2d 662 (1974); *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970).

8. Neither the original nor the amended complaint cite the legal authority upon which the hospital plaintiffs rely for their claimed remedies against the defendants. The claims simply assert that the proposed state regulatory amendment fails to comply with specified federal Medicaid statutes and regulations. However, in their supplemental memorandum in support of the motion for preliminary injunction, the hospital plaintiffs contend that the Medicaid statutes in their entirety imply a cause of action on their behalf, citing 28 U.S.C. § 1331 and *West Virginia Univ. Hospitals, Inc. v. Casey,* 885 F.2d 11 (3d Cir.1989), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990). The hospital plaintiffs also contend that they may assert a cause of action under 42 U.S.C. § 1983, citing *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) and *Arkansas Medical Society, Inc. v. Reynolds,* 6 F.3d 519 (8th Cir.1993).

While 28 U.S.C. § 1331 confers *jurisdiction* in this court to address federal questions, it does not authorize a private *cause of action* for redress of any claimed violation of federal law. *See Davis v. Passman,* 442 U.S. 228, 239–40 n. 18, 99 S.Ct. 2264, 2274–75 n. 18, 60 L.Ed.2d 846 (1979) (distinguishing the terms jurisdiction, standing, cause of action, and relief). The jurisdictional statute does not by itself entitle the plaintiffs to invoke the power of this court to remedy their claims.

Further, *West Virginia Univ. Hospitals* and *Wilder* were cases relying on the Boren Amendment, 42 U.S.C. § 1396a(a)(13), and *Arkansas Medical Society* asserted a violation of 42 U.S.C. § 1396a(a)(30)(A). While two of the hospital plaintiffs' six claims are grounded respectively in the Boren Amendment and § 1396a(a)(30)(A), the primary claim advanced by the plaintiffs, and the one the court considers to have the most merit, is based upon different statutory provisions, specifically 42 U.S.C. § 1396a(a)(14) and § 1396o.

The court considers it an open question whether the hospital plaintiffs have a cause of action to assert each and every one of their claims in this case. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) (listing factors relevant in determining whether private remedy is implicit in statute not expressly providing one, including whether the statute creates a federal right in favor of the plaintiff); *see also Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 108, 110 S.Ct. 444, 449, 107 L.Ed.2d 420 (1989) (availability of remedy under § 1983 turns in part on whether the statute is intended to benefit the putative plaintiff). As the Tenth Circuit held in *Archuleta v. McShan,* 897 F.2d 495, 497 (10th Cir.1990), a claim under 42 U.S.C. § 1983 must be based on the violation of a plaintiff's personal rights, not the rights of someone else. Even assuming the hospitals have

of the district court. *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986); *Jimenez v. Barber*, 252 F.2d 550, 554 (9th Cir.1958); *see also Sweeney v. Bane*, 996 F.2d at 1388. To obtain a preliminary injunction in federal court, the movant has the burden of establishing that:

> "(1) the party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits."

*Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992) (quoting *Tri–State Generation*, 805 F.2d at 355). If the moving party satisfies the first three elements, the standard for meeting the fourth requirement, likelihood of success on the merits, generally becomes more lenient. In such a case, the movant need only show that the issues are so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation.[9] *See id.* at 1199 (citing *Tri–State Generation*, 805 F.2d at 358); *see also Otero Sav. & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir.1981).

■ 1. *Irreparable Injury.* The court considers it significant that a hospital may not deny services to an eligible Medicaid beneficiary because of inability to pay the required copayment. *See* 42 U.S.C. § 1396o(e); 42 C.F.R. § 447.15. However,

inability to pay does not extinguish the individual's liability to the hospital for the copay amount. *Id.* The court must therefore conclude that none of the individual plaintiffs will be denied access to inpatient hospital care because of inability to pay the proposed increase in the copay requirement. Further, the copayment requirement does not apply at all to emergency hospital care, whether provided on an inpatient or outpatient basis. *See* 42 U.S.C. § 1396o(a)(2)(D), (b)(2)(D); 42 C.F.R. § 447.53(b)(4). Nor does it apply to children under age 18, pregnant women for pregnancy-related services, institutionalized persons subject to spend-down requirements, or certain HMO enrollees. *See* 42 U.S.C. § 1396o(a)(2), (b)(2); 42 C.F.R. § 447.53(b).[10] Hence, the court concludes that the individual plaintiffs will not be deprived of access to necessary hospital care if the increased copayment requirement takes effect.

The individual plaintiffs contend, however, that they will be deterred from seeking necessary hospital care by the imposition of a copayment at a level that they cannot afford to pay given their limited financial resources. The court agrees that there *may* be isolated instances during the course of this litigation in which Medicaid recipients would delay or reject necessary non-emergency inpatient hospital treatment out of concern that they will be unable to afford to pay $325 toward its cost. It is possible that such a decision could result in irreparable harm to the health of these individuals. However, the actual risk that such irreparable harm will in fact occur is at best speculative.

a cause of action, the court questions whether the hospital plaintiffs are entitled to the claimed injunctive relief, or whether they are limited to declaratory relief as authorized by 28 U.S.C. §§ 2201–02.

The court finds it unnecessary to resolve this issue at this early stage of the proceedings. Even if the hospital plaintiffs lack a cause of action or an injunctive remedy for some or all of their claims in this litigation, the individual plaintiffs may proceed under 42 U.S.C. § 1983 with their claims that defendant Whiteman has failed to comply with the Medicaid statutes. *See supra* note 8.

9. However, the Second Circuit, addressing a similar question, has held that "[if] a preliminary injunction 'seeks to stay governmental action taken in the public interest pursuant to a statutory

or regulatory scheme,' the less rigorous fair-ground-for-litigation standard should not be applied." *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir.1993) (quoting *Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)). In *Sweeney*, the copayments were *adopted pursuant* to a comprehensive *state statutory* amendment enacted in 1992 directing reductions in provider payments by imposing specified copayments not to exceed the maximum amounts authorized by federal law, with an annual recipient cap of $100. *See id.* at 1385–86.

10. The exclusions are sufficiently broad in scope that only approximately 16 percent of the Medicaid claims for inpatient hospital services in fiscal year 1993 were subject to the copayment requirement. *See* Declaration of Frank Webb, October 26, 1993.

The individual plaintiffs also express concern that no adequate guidelines have been provided for distinguishing between Medicaid recipients who are able to pay and those who are not. They argue that it is therefore a reasonable possibility that some persons who are in fact unable to pay will be denied inpatient hospital care if the provider considers them "able to pay" the copayment. *See* 42 C.F.R. § 447.15 (prohibition against denying services to eligible individuals on account of inability to pay cost-sharing amounts does not apply to an individual who is "able to pay"). The court understands this concern and admonishes the state agency to address it. However, the mere possibility that individuals may be denied care on the assumption that the agency will not carry out its responsibilities under 42 C.F.R. § 447.-53(d)(4) to identify Medicaid recipients who are unable to pay [11] is not enough to demonstrate irreparable harm.

■ The hospital plaintiffs contend that they will be irreparably harmed if the proposed copay increase takes effect, because many, if not most, Medicaid beneficiaries are financially unable to pay $325 per hospital admission. Consequently, the plaintiffs contend that the participating hospitals as a practical matter will have to assume the copay amount if it is uncollectible. They further argue that if the increase in the copay amount takes effect but is later overturned, the Eleventh Amendment bars a suit against the state for monetary relief. They therefore contend that the financial harm they anticipate if the amendment takes effect will be irreparable.

The plaintiff hospitals *may* indeed suffer a loss in revenue to the extent that they provide care to Medicaid beneficiaries who are in fact unable to pay the copayment. A hospital provider in that instance would be compelled to accept the state's payment, after a deduction for the copayment amount, in return for providing the care, with the hospital retaining a claim against the Medicaid beneficiary for the copayment.[12] To the extent the copayment is uncollectible from the beneficiary due to inability to pay, the hospital provider would incur a revenue loss, unless it elects to shift any unrecovered amounts to other payers.[13]

Under normal circumstances, monetary loss may be remedied by an award of compensatory damages, and the risk of such loss is therefore not considered irreparable. *See Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n*, 725 F.2d 564, 570 (10th Cir.1984). However, in this case, the Eleventh Amendment would generally bar the plaintiff hospitals from suing the state for monetary damages if it turns out that the proposed copay requirement is excessive. *See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Social and Rehabilitation Services*, 822 F.Supp. 687, 698 (D.Kan.1993) (cit-

---

11. The state Medicaid plan is required to specify, for each cost-sharing charge imposed, "[t]he basis for determining whether an individual is unable to pay the charge and the means by which such an individual will be identified to providers...." 42 C.F.R. § 447.53(d)(4). The wording of this regulation indicates an intent that the state agency take responsibility for identifying such individuals, whether by designating them in advance, or by at least issuing guidelines for use by providers in identifying such individuals. Otherwise, each health care provider would be in the position of making *ad hoc* determinations on a patient-by-patient basis prior to admitting a Medicaid patient for inpatient hospital care. *But cf. Sweeney v. Bane*, 996 F.2d at 1386, 1389 (New York permits a Medicaid recipient to provide a simple statement to the provider that he or she is unable to pay, which the provider must accept as sufficient).

12. Federal regulations preclude the state agency from increasing the payment it makes to provid-

er hospitals to offset uncollected Medicaid copayments. *See* 42 C.F.R. § 447.57.

13. The hospital plaintiffs argue that the legislative history of the Social Security Act provision permitting cost-sharing for inpatient hospital services indicates a Congressional intent not to shift costs from Medicaid recipients to non-Medicaid recipients. While that may be true, the hospital plaintiffs nevertheless retain the option of doing just that, and the court must give due consideration to the likelihood that hospitals will do so to recoup any losses incurred as a result of uncollectible copayments. A hospital may of course elect to pursue its claim against the beneficiary for the copayment. However, if the administrative costs associated with collecting the copayment are deemed prohibitive, the court is not aware of any law restricting a hospital's ability to increase its rates to other patients in order to recover its unreimbursed costs and maintain its revenue base.

ing *Temple Univ. v. White,* 941 F.2d 201, 215 (3d. Cir.1991), *cert. denied sub nom. Snider v. Temple Univ.,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)); *see also Florida Dep't of Health v. Florida Nursing Home Ass'n,* · 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) *(per curiam ). But see Sweeney v. Bane,* 996 F.2d at 1387 (affirming district court's order denying preliminary injunction, in part because burden of erroneous copayment is financial and therefore compensable by refund). The court therefore concludes that if the plaintiff hospitals incur revenue loss as a result of the increased copayment requirement, and if such losses cannot be otherwise recovered, such harm would be irreparable.

In summary, the plaintiffs have demonstrated the *possibility* that irreparable harm may result if this preliminary injunction does not issue. However, the court does not consider it a strong showing of irreparable harm, since the injuries asserted by both groups of plaintiffs are speculative in nature.

■■■ 2. *Balancing of Harms.* To obtain the preliminary injunction they seek, the plaintiffs must show that their potential injuries, absent the injunction, outweigh the injury to the defendant if the injunction does issue. *See Resolution Trust Corp. v. Cruce,* 972 F.2d at 1200. Although the court acknowledges the *possibility* of irreparable harm on the part of the plaintiffs if the preliminary injunction were not to issue, the speculative nature of that harm must be weighed against the *certainty* of the budgetary impact on the state if the preliminary injunction were to be granted.

The need to achieve budgetary savings in the Medicaid program, pursuant to the directive of the 1993 Kansas Legislature, was the primary factor [14] triggering consideration of the amendment.[15] When notice of the proposed amendment was published in the *Kansas Register* on July 1, 1993, the agency stated that the proposed change could be anticipated to generate $6.3 million in savings, of which $2.571 million would be savings to the State General Fund.[16] *See* 12 *Kansas Register* 1010 (No. 26, July 1, 1993). In her response to the motion for preliminary injunction, however, defendant Whiteman now asserts that the agency's original calculations were in error. Evidence has been submitted to the court showing that the amendment is now estimated to generate total annual savings of $2.1 million, of which $850,000 would be savings to the State General Fund.

The significant reduction in the amount of savings expected to be generated by the amendment alters the court's balance of harms analysis in several ways. The irreparable harm to the state if preliminary injunctive relief is erroneously granted is substantially less in terms of fiscal impact; however, the likelihood and degree of any irreparable harm to both the plaintiff hospitals and the individual plaintiffs is also substantially diminished. If the total program savings anticipated to result from the amendment amount to only $2.1 million as opposed to $6.3 million, unrecovered costs incurred by hospitals, if any, would also necessarily be significantly reduced and could be more readily absorbed or shifted to other payers. Similarly, the number of Medicaid recipients who might be deterred from obtaining necessary hospital care is necessarily smaller with the significant reduction in estimated program savings.

Even with the revised estimate of fiscal impact, the requested preliminary injunction would clearly have a direct and significant budgetary impact on the state. To the ex-

---

14. Defendant Whiteman has presented persuasive evidence that other factors were also taken into consideration in the decision to increase the copayment amount for inpatient hospital care.

15. The 1993 Kansas Legislature directed the Secretary to reduce the fiscal year 1994 medical assistance budget of the State Department of Social and Rehabilitation Services by a total of $11 million, including $5.7 million in state funds, giving the Secretary the discretion to determine how to generate the savings. The total amount budgeted for medical assistance programs in the fiscal year ending June 30, 1994, is $678.7 million, of which $162.8 million is allocated for inpatient hospital services.

16. Although the notice did not specify the period of time over which the anticipated savings would be generated, the court assumes the published figures were estimated annualized amounts for the current state fiscal year. The evidence submitted by the defendant supports this conclusion.

tent that the court's action delays implementation of the proposed increase in the copay obligation, the state will unquestionably incur greater costs for its Medicaid program than anticipated in the present medical assistance budget. The state would be required to pay the difference between the current copay requirement of $25 and the $325 the state proposes to charge Medicaid beneficiaries for each hospital admission not otherwise exempt from the copay requirement, or an additional $300 per non-exempt hospital admission for the duration of this litigation.

On the other hand, failure to grant the preliminary injunction would have only an indirect and speculative fiscal impact on plaintiff hospitals. As noted previously, the hospital provider would retain the option of recovering the copayment amount from the Medicaid patient at some later time, perhaps through a deferred payment plan, for example, or by billing third party payers.[17] Moreover, some beneficiaries would likely be able to pay all or at least a part of the increased copay requirement at the time the service is provided. Further, the hospital plaintiffs have a measure of control over the extent of the fiscal impact, since they have the option of pursuing collection of the copayment or making the administrative decision to write the obligation off as uncollectible. Hence, the actual fiscal impact on participating hospitals if the injunction were denied cannot be quantified.

As to the individual plaintiffs, the court finds that the harm caused by denying preliminary injunctive relief is also speculative. As previously noted, federal law precludes a participating hospital from denying hospital care to a Medicaid patient who is unable to pay the copayment requirement. The possibility that a Medicaid beneficiary would defer or reject inpatient hospital care because of the increased copayment is slim, especially considering that the decision to admit a patient to the hospital is generally made as a practical matter by the patient's physician, not the patient. Furthermore, the copay-

ment applies to only about 16 percent of the Medicaid claims for inpatient hospital services, according to the evidence submitted by the agency.

The court acknowledges that the state may be in a better position to absorb the budgetary impact of delayed implementation of the amendment as compared to Medicaid recipients, who in isolated cases may have great difficulty meeting the significantly increased copay requirement, and many small community hospitals that may elect to absorb uncollectible copay charges. Nevertheless, the budgetary impact on the state would be certain and significant in amount, while the risk of harm to the plaintiffs is speculative and, in the case of the hospitals, is somewhat subject to their administrative control. Therefore, upon further reflection, the court concludes that the balance of harms weighs in favor of the defendant.

The court is persuaded in its balance of harms analysis by the defendant Whiteman's argument that the present copayment amount of $25 is clearly substantially less than the amount the federal statutes and regulations would allow, even under the plaintiffs' interpretation. By imposing the requested preliminary injunction, however, the state agency would be precluded as a practical matter from increasing the present copayment by any amount. For reasons of comity, the court in exercising its discretion is reluctant to intrude upon the authority of the state to exercise its legislative and executive discretion to achieve budgetary savings within the constraints of federal law, absent a showing that the plaintiffs will otherwise suffer definite irreparable harm.

■ 3. *Public Interest.* It is appropriate to issue a preliminary injunction only if the moving parties show that the injunction would not be adverse to the public interest. *Resolution Trust Corp. v. Cruce,* 972 F.2d at 1201. *If,* as the plaintiffs contend, the proposed copay increase is unlawful, then the

17. Arguments on behalf of defendant Whiteman at the hearing on the temporary restraining order indicated that some Medicaid beneficiaries have private health insurance coverage by third party payers. The court acknowledges that the

individual plaintiffs named in this suit do not have third party coverage, but other members of the class the individual plaintiffs seek to represent may have such coverage available.

effect of a preliminary injunction would be to enforce the federal law and regulations governing the Medicaid program, which would clearly be in the public interest. *See Kansas Health Care Ass'n*, 822 F.Supp. at 699 (citing *Temple Univ. v. White*, 941 F.2d at 220).

On the other hand, the court acknowledges that Congressional policy, as expressed in legislative enactments, appears to favor the use of cost-sharing mechanisms by states participating in the Medicaid program. Over the past three decades, Congress has significantly expanded the authority of participating states to impose cost-sharing requirements on Medicaid beneficiaries. For example, the original legislation prohibited any type of cost-sharing requirement for inpatient hospital services. *See* 48 Fed.Reg. 5731 (1983). In 1967, the Social Security Act was amended to permit states to require cost-sharing for the medically needy, but not the categorically needy. In 1972, the Act was further amended to allow copayments for optional services for the categorically needy, with the condition that any copayment must be nominal in amount as defined by standards established by the federal agency. *Id.* In 1982, Congress amended the Act once again by removing restrictions on imposition of copayments on required services for the categorically needy, who at that time represented 74 percent of all Medicaid recipients. *Id.* However, Congress set forth several categorical exceptions to which copayment requirements could not apply, including children under 18, institutionalized individuals subject to spend-down requirements, pregnancy-related services, emergency services (whether inpatient or outpatient), and family planning services. *Id.* The 1982 amendment also prohibited participating providers from denying medical care to any individual because of inability to pay the cost-sharing amount, but expressly stated that this right of access to medical care did not extinguish the beneficiary's liability for the cost-sharing payment. *Id.* Further, the 1982 amendment also allowed a waiver of the "nominal amount" restriction on copayments for nonemergency services provided in hospital emergency rooms. States were allowed to

impose a copayment amount of up to twice the current maximum amount for such services. *Id.* at 5730, 5733; *see* 42 U.S.C. § 1396o(a)(3), (b)(3); 42 C.F.R. § 431.55(g).

The court interprets the legislative history to mean that Congress generally approves and even encourages participating states to impose required copayments, except in specified circumstances, for the purpose of encouraging efficiency in program administration and as a means of controlling utilization. *See id.* at 5731 (prior to 1982 amendment, cost-sharing regulations were a barrier to efficient program administration, and cost-sharing could not be used for utilization control because many services were excluded from cost-sharing). The legislative history makes clear that Congress has gradually but consistently expanded the authority of states to impose copayment requirements on Medicaid beneficiaries. Although Congress has not altered the language requiring such copayments to be nominal in amount, it permits a waiver of that restriction to allow states to establish a financial disincentive to patients who use hospital emergency rooms to obtain nonemergency medical care. The court is therefore of the opinion that defendant Whiteman's action proposing an increase in the copayment requirement is consistent with the Congressional policy expanding the authority of states to impose copayment requirements on Medicaid recipients. To impose a preliminary injunction barring *any* increase above the present $25 level would not serve the policy apparently adopted by Congress in permitting participating states to impose such copayments.

The court is also mindful of the fact that Congress has been increasingly concerned about its own budgetary demands. *See, e.g., Wilder v. Virginia Hosp. Ass'n*, 496 U.S. at 506, 110 S.Ct. at 2515 (Congress extended Boren Amendment to hospitals in response to rapidly escalating Medicaid costs, in order to give states more latitude in developing alternative reimbursement methods). The state's use of copayments for inpatient hospital services generates savings to the federal budget as well as to the state's.[18] While

---

**18.** The state's Medicaid program is financed 60

percent from federal funds and 40 percent from

achieving budgetary savings is in the public interest of both state and federal taxpayers, that interest must of course give way if it is in conflict with federal substantive law. *See AMISUB (PSL), Inc. v. State of Colo. Dep't of Social Services*, 879 F.2d at 800–01 (while state may consider budgetary constraints, such constraints may not excuse noncompliance with federal Medicaid law). In balancing these considerations, the court concludes that issuance of the preliminary injunction would not be adverse to the public interest as expressed by Congress, *if* the plaintiffs present a clear showing that the proposed copayment increase is in violation of federal restrictions on the state's authority to impose copayments.

4. *Likelihood of Prevailing on the Merits.* Having failed to establish to the court's satisfaction each of the first three standards for preliminary injunctive relief, the plaintiffs must show "a substantial likelihood [that they] will eventually prevail on the merits" of one or more of their claims, and the more lenient "fair ground for litigation" standard does not apply. *See Tri–State Generation*, 805 F.2d at 355, 358. The court concludes that the plaintiffs have not met this burden as to any of the claims for which there is a reasonable likelihood that they may ultimately obtain the remedy of injunctive relief.[19]

▮ A. *Standard of Review.* "In passing on the validity of a state Medicaid plan under federal law, the court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations...." *AMISUB*, 879 F.2d at 795. The initial inquiry is whether the copayment requirement is in compliance with the federal statute and regulations. *Id.* at 795 (quoting *Colorado Health Care Ass'n v. Colorado Dep't of Social Services*, 842 F.2d 1158, 1165 (10th Cir.1988)). This is

an issue of law subject to *de novo* review in federal court. *AMISUB*, 879 F.2d at 795. The state agency's determination of procedural and substantive compliance with federal law is not entitled to the same degree of deference afforded a federal agency. *Id.* (citing *Turner v. Perales*, 869 F.2d 140, 141–42 (2d Cir.1989)).

▮ If the court concludes that the agency's copayment increase complies with federal statutes and regulations, then the court defers to the state agency's exercise of discretion, unless the agency acted arbitrarily or capriciously. *Colorado Health Care Ass'n v. Colorado Dep't of Social Services*, 842 F.2d at 1165, *quoted in AMISUB*, 879 F.2d at 795. This latter standard is highly deferential; the agency's action is presumed valid if a reasonable basis exists for its decision. *AMISUB*, 879 F.2d at 800 (quoting *California Hosp. Ass'n v. Schweiker*, 559 F.Supp. 110, 116 (C.D.Cal.1982), *aff'd*, 705 F.2d 466 (9th Cir.1983)). Nevertheless, the court must engage in a thorough review of an agency's nonadjudicatory action to determine whether it was based upon " 'a consideration of the relevant factors and whether there was a clear error of judgment.' " *AMISUB*, 879 F.2d at 800 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

▮ B. *"Nominal in Amount."* The most persuasive argument advanced by the plaintiffs in support of their claims for injunctive relief is that the proposed copay requirement of $325 per admission for inpatient hospital services is not "nominal in amount." As noted previously, the statutes authorizing the Medicaid program, 42 U.S.C. § 1396 *et seq.*, presently permit the state to charge Medicaid beneficiaries for medical services, with certain categorical exceptions.[20] However, the statute places limita-

---

state funds.

**19.** Unless a particular cause of action asserted by the plaintiffs entitles them to permanent *injunctive* relief, the court need not consider it for purposes of deciding whether to grant a preliminary injunction. Preliminary injunctive relief during the pendency of the proceeding is not appropriate, for example, to redress a claim for

which the plaintiffs may ultimately obtain only declaratory relief under 28 U.S.C. § 2201.

**20.** For example, the state may not require a copay for services to children, pregnant women for pregnancy-related services, institutionalized individuals subject to spend-down requirements, or any beneficiary for emergency medical services. *See* 42 U.S.C. § 1396o(a)(2)(A)–(D);

tions on the state's authority to do so. Section 1396a(a)(14) provides that "[a] State plan for medical assistance must ... provide that ... deductions, costsharing, or other charges may be imposed only as provided in section 1396o of this title." Section 1396o(a) and (b)[21] both provide in part:

> The State plan shall provide that in the case of individuals ... who are eligible under the plan—
>
> (3) *any deduction, cost sharing, or similar charge imposed* under the plan ... *will be nominal in amount (as determined by the Secretary [of Health and Human Services] in regulations* which shall, if the definition of "nominal" under the regulations in effect on July 1, 1982 is changed, take into account the level of cash assistance provided in such State and such other criteria as the Secretary determines to be appropriate)....

(Emphasis added.) The parties are in agreement that the definition of "nominal" under the regulations of the Secretary in effect on July 1, 1982, has not been changed, except for a minor clarifying amendment which was expressly intended not to alter the regulatory definition of "nominal." *See* 48 Fed.Reg. 5732–33, 5736 (1983).

The regulations adopted by the Secretary of Health and Human Services to implement the statute[22] appear in 42 C.F.R. §§ 447.50–447.59 and provide in part:

> § 447.53 **Applicability; specification; multiple charges.**
>
> (a) ... [T]he plan may impose a nominal deductible, coinsurance, copayment, or similar charge upon categorically and med-

ically needy individuals for any service under the plan.

§ 447.54 **Maximum allowable charges.**

(a) *Non-institutional services.* Except as specified in paragraph (b), for non-institutional services, the plan must provide that—

(1) Any deductible it imposes does not exceed $2.00 per month per family for each period of Medicaid eligibility....;

(2) Any coinsurance rate it imposes does not exceed 5 percent of the payment the agency makes for the services; and

(3) Any co-payments it imposes do not exceed the amounts shown in the following table:

| State's payment for the service | Maximum copayment chargeable to recipient |
|---|---|
| $10 or less | $ .50 |
| $10.01 to $25 | 1.00 |
| $25.01 to $50 | 2.00 |
| $50.01 or more | 3.00 |

(b) *Waiver of the requirement that cost sharing amounts be nominal.* Upon approval from HCFA, the requirement that cost sharing charges must be nominal may be waived ... for nonemergency services furnished in a hospital emergency room.

(c) *Institutional Services.* For institutional services, the plan must provide that the maximum deductible, co-insurance or co-payment charge for each admission does not exceed 50 percent of the payment the agency makes for the first day of care in the institution.

(d) *Cumulative maximum.* The plan may provide for a cumulative maximum amount for all deductible, coinsurance or

---

(b)(2)(A)–(D); *see also* 42 C.F.R. § 447.53(b)(1)–(4).

**21.** Subsection (a) applies to Medicaid beneficiaries classified as "categorically needy" and subsection (b) to the "medically needy." *See* 42 C.F.R. § 447.53(a). The pertinent language with regard to the defendant's authority to charge a copay is identical in both subsections.

Participating states are also permitted to charge an income-related enrollment fee, premium, or other similar charge to medically needy recipients, but not those who are categorically needy. *See* 42 U.S.C. § 1396o(a)(1), (b)(1); 42 C.F.R. § 447.51. The copayment at issue in this

case is not within this category of cost-sharing mechanisms.

**22.** The court notes that for purposes of the pending motion seeking a preliminary injunction against defendant Whiteman, the court cannot consider the individual plaintiffs' claim that the federal regulations are inconsistent with the federal statute that authorizes them. Rather, the issue before the court is whether defendant Whiteman's actions and proposed state regulations are inconsistent with the federal regulations. The plaintiffs, of course, cannot assert their challenge to the federal regulations against defendant Whiteman, who is responsible only for promulgating the state regulations.

co-payment charges that it imposes on any family during a specific period of time.

§ 447.55 **Standard co-payment.**

(a) The plan may provide for a standard, or fixed, co-payment amount for any service.

(b) This standard copayment amount for any service may be determined by applying the maximum copayment amounts specified in § 447.54(a) and (b) to the agency's average or typical payment for that service. For example, if the agency's typical payment for prescribed drugs is $4 to $5 per prescription, the agency might set a standard copayment of $0.50 per prescription.

The plaintiffs contend that the $325 copayment for each hospital admission is not "nominal in amount." While the court agrees that the proposed copay amount does not appear to be "nominal" as that term is generally understood,[23] the statute delegates the authority to the Secretary of Health and Human Services to define the term "nominal" by federal regulation. Therefore, in order to determine whether the proposed copayment for inpatient hospital services is "nominal in amount," the court must attempt to interpret and apply the federal regulations.

It appears to this court that the maximum amount the state can charge for inpatient hospital services is controlled by 42 C.F.R. § 447.54(c). Under that regulation, the maximum amount a beneficiary may be charged as a copay may not exceed half of the amount the defendant pays for the first day of inpatient care. In Kansas, the defendant sets payment rates to general hospital providers of inpatient services on the basis of diagnosis related groups (DRGs). *See* K.A.R. 30–5–58(a)(28); 30–5–81b(b); 30–5–81v(a). This payment method does not readily translate into a daily payment rate, because payment is made upon discharge on the basis of the patient's particular diagnosis, regardless of the number of days the patient is actually hospitalized. Nevertheless, the plaintiffs contend that for numerous DRG categories, the proposed $325 copay amount would exceed 50 percent of the amount the agency pays on the average for each day of a Medicaid patient's stay.[24]

Defendant Whiteman, however, contends that the average amount paid for an inpatient hospital day for Kansas Medicaid beneficiaries is $674, and 50 percent of that average amount exceeds the proposed copayment of $325.[25] The defendant also argues that the calculated average amount paid per Medicaid hospital day understates the actual amount the agency pays for the *first* day of care, which is the most expensive day of any hospital admission. While the defendant concedes that for some DRG categories the $325 amount may exceed 50 percent of the calculated average amount paid on a daily basis, she contends that the federal law does not require the state to establish the copayment amount at a level that would never exceed half the state's payment for the first day of care for any particular diagnosis. The agency relies on 42 C.F.R. § 447.55(a), which permits the state's Medicaid plan to provide for a standard, or fixed, co-payment amount for any service. The court finds the defendant's argument persuasive.

The plaintiffs contend that the state may not impose a standard copayment on inpatient hospital services because 42 C.F.R. § 447.55(b) references the maximum copayment amounts specified in § 447.54(a) and (b), but not (c), the subsection that sets the allowable maximum for institutional services, including inpatient hospital services. The court rejects this argument. First, subsec-

---

23. "Nominal" has several meanings, but the one pertinent to this case has been defined by one source as follows: "(of a price, consideration, etc.) named as a mere matter of form, being trifling in comparison with the actual value." *The Random House Dictionary of the English Language* 970 (unabridged ed. 1979).

24. Plaintiffs have calculated their figures on the basis of data indicating the average length of stay for each DRG classification. In other words, they have calculated an average payment per day for each DRG classification by dividing the amount paid for a particular DRG by the average length of stay in days for that DRG.

25. The average amount paid per inpatient hospital day for only those admissions subject to the copayment is $672. *See* Declaration of Frank Webb, October 26, 1993.

tion (b) of § 447.55 simply explains *how* the standard copayment amount may be determined; it does not diminish the import of subsection (a) which permits the plan to provide for a fixed or standard copayment for *any service.*[26] Second, the defendant has submitted excerpts from the *Federal Register* showing that the exact language of the subsection now designated as (c) in § 447.54 previously appeared as subsection (b) prior to the regulatory amendments made by the federal agency in 1983. The language now appearing as subsection (b) implemented the 1982 statutory amendment waiving the "nominal" limitation on copayments for nonemergency services obtained in hospital emergency rooms.[27] *See* 42 U.S.C. § 1396o(a)(3) cl. 2, (b)(3) cl. 2; *see also* 42 C.F.R. § 431.55(g). At the time those regulatory amendments were made, it is clear to this court, after reviewing the exhibits submitted with the defendant's response, that the federal agency simply overlooked the need to make a parallel technical amendment to update the cross-references in § 447.55 to the appropriate redesignated subsections in § 447.54.

The court concludes that the federal regulations clearly permit the state to impose a standard or fixed copayment amount for inpatient hospital care. *See* 42 C.F.R. § 447.55(a). Further, they authorize the state to determine the amount of the standard or fixed copayment by applying the 50 percent limitation in § 447.54(c) to "the agency's average or typical payment for that service," *see* 42 C.F.R. § 447.55(b), which the agency has calculated as $674.[28] The defendant has submitted evidence showing that the proposed copayment of $325 was determined after applying 50 percent to the average, or typical, amount the agency pays for each day of inpatient hospital care for Medicaid recipients. This is exactly what the federal regulations require. The court must therefore conclude that the agency's determination of the proposed copayment for inpatient hospital care of $325 per admission is consistent with the federal regulations defining "nominal in amount."

Since the plaintiffs have not demonstrated that the increased copayment fails to comply with federal regulations defining "nominal in amount," this court must defer to the state agency's exercise of discretion, absent a showing that the agency acted arbitrarily and capriciously. *Colorado Health Care Ass'n,* 842 F.2d at 1165. Since the agency has advanced a reasonable basis for its decision setting the copayment amount at $325 per admission, the agency's action is presumed valid. *See AMISUB,* 879 F.2d at 800. The evidence submitted to this court does not demonstrate a clear error of judgment on the part of the defendant. *See id.* Therefore, the plaintiffs are not likely to prevail on their claim that the proposed copayment of $325 is not "nominal in amount" as required by 42 U.S.C. § 1396o(a)(3), (b)(3) pursuant to the definition set forth in 42 C.F.R. § 447.54(c).

■ 2. *Efficiency, Economy, Quality of Care, and "Equal Access."* The plaintiffs next claim that the defendant's proposed increase in the copayment requirement does

**26.** The court finds unpersuasive the hospital plaintiffs' hypertechnical argument advanced at the hearing contending that the singular word "service" in § 447.55 cannot possibly apply to the many "services" provided by a hospital to an inpatient. Following this argument to its logical conclusion, the plaintiffs' argument would have the state calculate a different maximum copayment for each and every Medicaid recipient for each particular hospital admission, depending upon the specific services provided to that patient during his or her first day of inpatient hospital care. A fair reading of the regulations makes clear that this is not required.

Further, the hospital plaintiffs complain that the defendant's interpretation of the regulations would allow the copayment to be even higher than the $325 level. The issue presently before

the court, however, is not whether the maximum allowable copayment is too high; it is whether the $325 copayment established by defendant Whiteman is within the maximum established by the federal regulation.

**27.** See discussion *supra* p. 1565.

**28.** The deposition of Frank Webb, a management analyst employed by the agency, indicates that the $674 average daily payment is calculated on the basis of actual claims paid in fiscal year 1993, which closed June 30, 1993. It is therefore fair to assume that the actual claims paid in the current fiscal year, which began July 1, 1993, will result in an average payment per day higher than $674. *See* Webb Deposition, October 19, 1993, at 16–18.

not comply with 42 U.S.C. § 1396a(a)(30)(A), which reads:

A State plan for medical assistance must—

(30)(A) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area; ....[29]

If, as the plaintiffs contend, the significant increase in the copay requirement is proposed *solely* because of its budgetary impact in favor of the state, without considering the other factors listed in the statute, the amendment would appear to violate 42 U.S.C. § 1396a(a)(30)(A). As the courts have interpreted this statutory requirement, budgetary considerations alone cannot dictate decisions concerning changes in the Medicaid program. *See Arkansas Medical Society, Inc. v. Reynolds,* 6 F.3d 519, 530 (8th Cir.1993) (citing, e.g., *AMISUB (PSL), Inc. v. State of Colo. Dep't of Social Services,* 879 F.2d at 800–01)).

Defendant Whiteman's response to the motion for preliminary injunction suggests that this statute does not apply to the proposed increase in the copayment amount. The court believes that the applicability of this statutory provision turns on whether or not an increase of $300 in the required copayment for inpatient hospital services falls within the category of "methods and procedures relating to the utilization of, and the payment for, care and services available under the plan...." The court is of the opinion that the significant increase proposed by

the Secretary in the copayment amount qualifies the proposed amendment as just such a method or procedure. One of the reasons the defendant has advanced in support of the increased copayment is increasing personal responsibility for controlling utilization of inpatient hospital services. Further, the proposed increased copayment is clearly directly related to payment by the state for inpatient hospital services, because the amount of the copayment is a direct offset to the amount the agency pays a participating hospital for providing care.[30]

However, defendant Whiteman has presented evidence showing that the state agency did in fact consider the requisite factors listed in § 1396a(a)(30)(A) before deciding to implement the increase. Specifically, the agency considered the fiscal impact on hospital providers and the possible impact on Medicaid patients. The agency particularly focused on the policy of encouraging Medicaid recipients to obtain preventative care so as to reduce the need for inpatient hospital services. The agency also considered its policy of encouraging personal responsibility on the part of Medicaid patients to encourage appropriate utilization of hospital resources. Further, the agency considered the resources available to Medicaid recipients and whether the change would result in decisions to defer hospital care. Finally, the agency considered the relatively healthy current financial posture of Kansas hospitals, including the positive fiscal effect of recent federal legislation providing for Medicaid reimbursement to hospitals for services provided to low-income women and children who previously would have been ineligible for such benefits. The agency concluded after considering these factors that the copayment increase would not result in reduced access to hospital care.

The court has no reason to doubt the veracity of this evidence, and the plaintiffs have not presented any evidence to refute it. Therefore, the court must conclude that the plaintiffs are unlikely to prevail on their

---

**29.** The last clause of this subsection has been referred to by the courts as the "equal access" provision. *See, e.g., Fulkerson v. Comm'r, Maine Dep't of Human Services,* 802 F.Supp. 529, 532–34 (D.Me.1992).

**30.** That the copayment level is directly related to the state's *payment* for services rendered does not mean, however, that the copayment level affects the *rate* paid by the state for inpatient hospital services. See discussion *infra* pp. 1575–76.

**1572**

claim that defendant Whiteman proposed the increase solely for budgetary reasons without considering any of the other factors set forth in 42 U.S.C. § 1396a(a)(30)(A).[31]

■ 3. *Medical Care Advisory Committee.* Plaintiffs contend that the defendant violated 42 C.F.R. § 431.12 by failing to consult with the required medical care advisory committee with regard to the proposed increase in the copayment for inpatient hospital services. The cited regulation requires a state Medicaid plan to provide for a medical care advisory committee to advise the state Medicaid agency director regarding health and medical care services. *See* 42 C.F.R. § 431.12(b). Committee members, appointed by the agency director or a higher state authority, must include representatives of the health care profession who are familiar with the medical needs and financial resources of low-income groups, and members of consumer groups, including Medicaid beneficiaries. 42 C.F.R. § 431.12(e) specifically requires:

> (e) *Committee Participation.* The committee must have the opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program.

Relevant case law from other jurisdictions indicates that, if consultation with the committee is required, the committee's input must be solicited before the state action in question, not after the fact. *Morabito v. Blum,* 528 F.Supp. 252, 264 (S.D.N.Y.1981) (citing cases). Further, the courts have held that the state does not satisfy its duty to meet with the committee if it was improperly

constituted at the time it was consulted. *Id.* at 266 (citing cases).

The agency contends that a mere change in the amount of a copayment does not amount to "policy development and program administration," and therefore the regulation does not apply. The court disagrees with this characterization. An increase in the amount of the copayment for inpatient hospital services of the magnitude proposed by the defendant in this case, from $25 to $325 per hospital admission, is clearly a major policy change. The language of the regulation therefore requires that the medical care advisory committee have the opportunity to participate in such policy development. *Cf. Becker v. Toia,* 439 F.Supp. 324, 333 (S.D.N.Y.1977) (proposal and enactment of copayment provision, where there was none before, constitutes major policy development requiring participation by medical care advisory committee). *But cf. Himes v. Shalala,* 999 F.2d 684, 691 (2d Cir.1993) (consultation with medical care advisory committee unnecessary if substantive policy change is made by state legislative enactment).

The agency further contends that the issue was raised before an advisory committee on June 14, 1993, and a representative of the Kansas Hospital Association is on record as having raised concerns at that meeting about the proposal. The evidence submitted by the agency supports this assertion. However, the court finds that the advisory committee the defendant consulted regarding the proposed copayment increase did not include representatives of Medicaid recipients as required by the regulation.[32] *See Morabito v. Blum,* 528 F.Supp. at 275 n. 24 (requirements of the regulation are met with respect

---

31. In so holding, however, the court need not and does not decide whether a violation of § 1396a(a)(30)(A) may be remedied by injunctive relief. *Compare Arkansas Medical Society, Inc. v. Reynolds,* 6 F.3d at 525–28 *with Fulkerson v. Comm'r, Maine Dep't of Human Services,* 802 F.Supp. at 533–35. The court simply concludes that the defendant has submitted persuasive evidence showing that she complied with the requirements of that subsection, and hence the plaintiffs are not substantially likely to prevail on this claim. Hence, the court need not address whether the plaintiffs could obtain injunctive relief for such a violation, assuming it were established.

32. The court acknowledges the affidavit of Joyce Sugrue, State Medicaid Director, which states that she invited representatives of consumer groups, including advocacy groups for low-income individuals and persons with disabilities, to the June 14 advisory committee meeting. However, representatives of these organizations did not attend. Even if they had, however, the regulation requires that members of consumer groups, *including Medicaid recipients,* must be *members* of the advisory committee, not just invitees to its meetings.

to consumer group representation as long as membership of a medical care advisory committee includes more than one Medicaid recipient and more than one member of a consumer organization). Rather, the agency invited a number of organizations to attend the meeting to discuss upcoming budget issues and to discuss development of an ongoing advisory committee, which would include representatives of consumers, the public, and providers.[33] Therefore, the court is compelled to conclude that the plaintiffs are likely to prevail on their argument that the defendant violated 42 C.F.R. § 431.12 by failing to satisfy her duty to consult in advance with a properly constituted medical care advisory committee with regard to the proposed copayment increase.[34]

■ Nevertheless, the court concludes that the plaintiffs are not entitled to the requested injunctive relief to remedy this claim, however meritorious it may be. The Medicaid *statutes* do not require participating states to establish or consult with medical care advisory committees. *See Morabito v. Blum,* 528 F.Supp. at 264. The regulation

imposing this requirement on participating states is based on § 1902(a)(4) of the Social Security Act, codified at 42 U.S.C. § 1396a(a)(4). *See* 42 C.F.R. § 431.12(a); *see also Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. 721, 727 & n. 10 (W.D.Okla.1992). The pertinent provisions of the authorizing statute require only that states make certain provisions in their plans for utilization of professional medical personnel in the administration of the plan, and for the employment of Medicaid recipients and other low-income persons in administering the plan and in assisting any advisory committees established by the State agency.[35]

The court declines to follow the holdings of district courts in other jurisdictions concluding that the regulation at issue here conveys independent rights to the plaintiffs that may be enforced under 42 U.S.C. § 1983. *See, e.g., Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. at 727; *Morabito v. Blum,* 528 F.Supp. at 266; *Becker v. Toia,* 439 F.Supp. at 333. Administrative regulations may be construed by the courts as

33. Agency officials, in asserting compliance with the intent of 42 C.F.R. § 431.12(a), have repeatedly referred to their various efforts to consult with "providers." However, the regulation specifically requires the medical care advisory committee to include as members board-certified *physicians* and other representatives of the health care *profession*, members of consumer groups, including Medicaid recipients, and the director of the state health department. The regulation at issue here does not require that the committee include representatives of hospitals or other "providers," other than health care professionals.

34. Plaintiffs have submitted evidence indicating that the state agency acknowledges its failure to formally comply with the regulation's requirements in the past and is currently attempting to establish a formal medical care advisory committee. *See* Letter from Robert L. Epps, Commissioner, Income Support/Medical Services to Don Wilson, Kansas Hospital Association, October 5, 1993 (Exhibit L attached to plaintiffs' first amended complaint).

35. The full text of § 1396a(a)(4) is certainly not a model of legislative clarity. It reads as follows:

A state plan for medical assistance must—
(4) provide (A) such methods of administration (including methods relating to the establishment and maintenance of personnel standards on a merit basis, except that the Secre-

tary shall exercise no authority with respect to the selection, tenure of office, and compensation of any individual employed in accordance with such methods, and including provision for utilization of professional medical personnel in the administration and, where administered locally, supervision of administration of the plan) as are found by the Secretary to be necessary for the proper and efficient operation of the plan, (B) for the training and effective use of paid subprofessional staff, with particular emphasis on the full-time or part-time employment of recipients and other persons of low income, as community service aides, in the administration of the plan and for the use of nonpaid or partially paid volunteers in a social service volunteer program in providing services to applicants and recipients and in assisting any advisory committees established by the State agency, and (C) that each State or local officer or employee who is responsible for the expenditure of substantial amounts of funds under the State plan, each individual who formerly was such an officer or employee, and each partner of such an officer or employee shall be prohibited from committing any act, in relation to any activity under the plan, the commission of which, in connection with any activity concerning the United States Government, an individual who was such an officer or employee, or the partner of such an officer or employee is prohibited by section 207 or 208 of Title 18; . . . .

defining the scope of the rights created by statute. *Oklahoma Nursing Home Ass'n,* 792 F.Supp. at 726 (citing *Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. 418, 429–30, 107 S.Ct. 766, 773–74, 93 L.Ed.2d 781 (1987)). In this case, however, the statute itself does not create or even imply a judicially enforceable right on the part of the individual plaintiffs, as Medicaid recipients, to participate as members of any advisory committee established by the state Medicaid agency.[36]

The court does not mean to suggest that the state need not comply with the regulation, which of course has the force and effect of law. Rather, the court simply holds that any rights the plaintiffs claim by virtue of the *regulation* cannot be remedied by this court by granting the plaintiffs the injunctive relief they seek under the authority of 42 U.S.C. § 1983. The court specifically holds that the regulation at issue, 42 C.F.R. § 431.12, and its authorizing legislation, 42 U.S.C. § 1396a(a)(4), do not imply a private cause of action on behalf of the plaintiffs.[37] *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. at 509, 110 S.Ct. at 2517; *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. at 108, 110 S.Ct. at 449. Therefore, the plaintiffs are not likely to prevail on the merits of this claim, even though they have a meritorious argument that the agency has failed to comply with the specific requirements of the regulation.

■ 4. *Public Hearing Notice.* The individual plaintiffs have asserted in their amended complaint that the defendant violated the regulations implementing the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.,* specifically, the notice re-

quirements of 28 C.F.R. § 35.160(a), which reads:

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

They argue that the notice published in the *Kansas Register* on July 1, 1993, announcing the public hearing to be held on August 5, 1993, concerning the proposed amendment failed to meet the requirement that the state's communications with persons with disabilities must be "as effective as communications with others."

In support of this argument, the plaintiff relies on an 1992 unpublished opinion of a New Mexico state district court, which granted a writ of mandamus against the Secretary of the New Mexico Department of Human Services for failing to provide notice to persons with disabilities of the availability of special accommodations for the disabled at a public hearing on proposed amendments to the state's Medicaid program. However, in that case the court specifically found that several hundred persons appeared at the hearing, and the state had effectively discouraged many disabled individuals from attending and participating at the meeting by not providing effective notice to the disabled public *and* by failing to provide adequate means of access to the public hearings for persons with mobility impairments, thereby amounting to failure to comply with 42 U.S.C. § 12132.

In this case, the plaintiffs concede that the state provided a sign-language interpreter at the public hearing, and it was held in a facility accessible to the mobility impaired. However, they contend that the notice itself

---

**36.** The court cannot perceive any basis whatsoever in the statute or the regulation to support the claim of the hospital plaintiffs on this theory. Neither the statute nor the regulation indicates any intent that such a committee must include hospital representatives.

**37.** The court acknowledges, but declines to follow, the Third Circuit's holding in *West Virginia Univ. Hospitals, Inc. v. Casey,* 885 F.2d at 18, that valid federal regulations may create rights enforceable under § 1983. To support this conclusion, the Third Circuit relied upon language in

*Wright v. City of Roanoke Redevelopment and Hous. Auth.,* 479 U.S. at 431–32, 107 S.Ct. at 774–75. However, the federal regulation cited by the *Wright* Court was authorized by a statute which clearly conveyed rights to housing tenants to be charged only a limited amount for rent. *See id.* at 430, 107 S.Ct. at 773. In this case, in contrast, the statute cited as the authorization for the Medical Care Advisory Committee regulation conveys no such clear right to Medicaid recipients to be consulted by the agency in advance of implementing any Medicaid policy change.

was defective because it failed to provide effective notice to *communicate* to disabled persons about their opportunity to participate in the hearing.

Plaintiffs have not cited the court to any authority showing that they are entitled to injunctive relief under 42 U.S.C. § 1983 on the basis that the defendant has failed to comply with the specific requirements of 28 C.F.R. § 35.160(a) in giving notice of the public hearing. In the absence of any such holding by a federal court, the court cannot conclude that the plaintiffs are likely to prevail on their claim for injunctive relief on the basis that the notice of public hearing did not comply with 28 C.F.R. § 35.160(a).

Further, none of the named individual plaintiffs assert any particular disability that affected their ability to participate in the public hearing because of the nature of the notice. Therefore, even if the plaintiffs have such a cause of action, they have not asserted facts to show they have standing to bring such a claim.

5. *Defective Notice of Copayment Amendment.* Both the individual plaintiffs and the hospital plaintiffs contend that the defendant gave them ineffective notice of the copayment increase.

■ The individual plaintiffs contend that defendant Whiteman violated 42 U.S.C. § 1396a(a)(3), 42 C.F.R. § 435.919, and 42 C.F.R. § 431.210–211. The cited statute is inapplicable; it simply provides for a fair hearing to any individual whose claim for medical assistance has been denied or not acted upon with reasonable promptness. Nor is 42 C.F.R. § 435.919 applicable; it requires a state agency to give notice of a proposed action to terminate, discontinue, or suspend a recipient's eligibility or to reduce or discontinue *services* they may receive under Medicaid. The proposed copayment increase for inpatient hospital services has not been shown to have any of these effects. Similarly, 42 C.F.R. §§ 431.210–211 do not provide a basis for relief in this case. They implement the notice requirements of 42 U.S.C. § 1396a(a)(3) providing a fair hearing to a person whose claim for assistance is either denied or not acted upon promptly, or if the agency takes action to suspend, termi-

nate, or reduce services. *See* 42 C.F.R. § 431.200. The proposed copayment increase is simply not the type of agency action to which these notice requirements apply.

■ The hospital plaintiffs rely upon 42 C.F.R. § 447.205(a) in contending that the defendant's notice to them concerning the amendment violated federal law. That regulation reads as follows:

> (a) *When notice is required.* Except as specified in paragraph (b) of this section, the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services.

The language of the regulation requires public notice of certain changes in methods and standards for setting *rates* of payment for services provided. As such, it does not apply to the imposition of copayments. *Fulkerson v. Comm'r, Maine Dep't of Human Services,* 802 F.Supp. at 536; *cf. Himes v. Shalala,* 999 F.2d at 692 (notice requirement of § 447.-205(a) inapplicable to changes in Medicaid eligibility; notice requirements apply only to changes in rate setting methodology). It follows that the cited regulation does not apply to an *increase* in a copayment.

However, even if the regulation were applicable, the public notice published by the agency in the *Kansas Register* on July 1, 1993 would appear to have substantially satisfied the requirements of 42 C.F.R. § 447.-205.

The court therefore concludes that neither the individual plaintiffs nor the hospital plaintiffs are likely to prevail on their defective notice claims.

■ 6. *Boren Amendment and Related Assurances.* The hospital plaintiffs contend that the defendant has violated 42 C.F.R. § 447.253 for failure to submit the proposed copayment increase along with certain required assurances for approval by the Health Care Financing Administration (HCFA), the federal agency responsible for implementing the Medicaid statute. They also argue that the defendant has violated the statutory pro-

vision known as the Boren Amendment [38] by failing to make payments to hospitals for services rendered at rates that are reasonable and adequate to meet the cost of efficiently and economically operated facilities. Because the cited regulation implements the referenced statutory provision, *see* 42 C.F.R. § 447.250(a), the court will address these arguments together.[39]

The Boren Amendment reads in pertinent part as follows:

A State plan for medical assistance must—

(13) provide—

(A) for payment ... of the hospital services ... through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality;

....

42 C.F.R. § 447.253(b)(1) requires participating states to make findings at least annually that payment rates for inpatient hospital services are consistent with the statutory requirement that they be reasonable and adequate to meet costs.

The court is in agreement with defendant Whiteman's argument that the Boren Amendment and its implementing regulations do not apply to the proposed increase in the copayment charged to Medicaid recipients. The Boren Amendment addresses the adequacy of the *rates* paid by the state in terms of the extent to which they reimburse an appropriate level of costs. As previously explained, the rates paid by the defendant are based upon diagnosis related groups (DRGs) and are determined on the basis of the particular medical diagnosis of the Medicaid patient. The copayment amount, on the other hand, addresses the relative liabilities of the state and the Medicaid patient for the satisfaction of the obligation owed to the provider for the services rendered. The total amount of the obligation to the hospital for the services rendered is determined by the rate, while the relative liabilities of the respective payers responsible for satisfying the obligation are determined by setting the copayment level. *Cf. Fulkerson,* 802 F.Supp. at 536 ("imposition of co-payments does not constitute a method or standard of setting payment rates").

Even if the defendant is required to submit assurances to HCFA as the defendant contends, the state need not submit a state plan change to HCFA for approval in advance of implementing the amendment. *See* 42 C.F.R. § 447.256(b), (c). Assuming the

---

**38.** The provision that has come to be known as the Boren Amendment is codified at 42 U.S.C. § 1396a(a)(13)(A). *See Wilder v. Virginia Hospital Ass'n,* 496 U.S. at 501–02, 506–07, 110 S.Ct. at 2513–14, 2515–16. Neither the original complaint nor the amended complaint in this case cite this statutory provision. However, the hospital plaintiffs' counsel repeatedly emphasized their Boren Amendment claim at oral argument on the motion for a preliminary injunction. The court therefore assumes in this discussion that the reference to 42 U.S.C. § 1396a(a)(30)(A) in Count IV of both the original and amended complaints advanced by the hospital plaintiffs was intended to refer to 42 U.S.C. § 1396a(a)(13)(A), the Boren Amendment.

**39.** The hospital plaintiffs cite 42 C.F.R. § 447.-253 as the basis of Count III of their complaint, but they do not specify the particular subdivision upon which they rely. Count III alleges that the

regulation requires the defendant to submit "any change in payment methods and standards to the Health Care Financing Administration for approval along with required assurances." As best the court can determine, Count III relies upon 42 C.F.R. § 447.253(a), which generally requires the state to make assurances satisfactory to HCFA to obtain approval of a state plan change in payment methods and standards.

In Count IV of their complaint, the hospital plaintiffs again cite § 447.253 in conjunction with an argument apparently intended to rely upon the Boren Amendment, although citing to 42 U.S.C. § 1396a(a)(30)(A). *See supra* note 38. The court assumes that the reference in Count IV is intended to be to § 447.253(b)(1), which virtually echoes the specific statutory language of the Boren Amendment upon which Count IV of the complaint apparently relies. The court will not speculate further as to the intent of the hospital plaintiffs in so framing the complaint.

proposed amendment had been implemented on October 1, 1993, as originally planned, the defendant would have had up to the end of the current calendar year to obtain HCFA approval. *See id.* The hospital plaintiffs conceded this point at the hearing on the motion for a temporary restraining order.

### Conclusion

Consequently, on the basis of the evidence presently available, the court concludes that the plaintiffs have not demonstrated a substantial likelihood that they will prevail in obtaining the requested injunctive relief on the merits of any of their claims against defendant Whiteman. Further, the balance of harms tips in favor of the defendant, and the plaintiffs have not demonstrated that issuance of the preliminary injunction would be in the public interest.[40]

**IT IS BY THE COURT THEREFORE ORDERED** that the plaintiffs' motion for a preliminary injunction against defendant Donna Whiteman in her official capacity as Secretary of Social and Rehabilitation Services (Doc. 2) is hereby denied.

**IT IS FURTHER ORDERED** that the temporary restraining order entered by this court on October 4, 1993, is hereby dissolved effective with the date of this superseding order.

**IT IS FURTHER ORDERED** that the plaintiffs are hereby relieved from any further obligations on their bond.

---

**40.** The court declines to rule on the plaintiffs' motion for class certification (Doc. 5) until such time as the defendant has filed a written response to that motion. At the hearing on the preliminary injunction, the court granted defendant Whiteman's oral motion for an extension of time until November 12, 1993, to respond to that motion.