James SWEENEY, William Drumright, Theresa Saponara, and Gabriel Folarin, Helen M. and Ethel Dankberg, on behalf of themselves and all persons similarly situated, Plaintiffs–Appellants,

v.

Mary Jo BANE, individually and in her capacity as Commissioner of the New York State Department of Social Services, Defendant–Appellee.

Nos. 805, 982, Dockets 92–7924, 92–9138.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1993.

Decided June 17, 1993.

Jonathan Ben–Asher, New York City (Toby Golick, Cardozo Bet Tzedek Legal Services, New York City, Jane E. Booth, Constance P. Carden, The Legal Aid Soc., New York City, Valerie J. Bogart, Jonathan A. Weiss, Legal Services for the Elderly, New York City, of counsel), for plaintiffs-appellants.

Judy E. Nathan, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, New York City, Robert J. Schack, Asst. Atty. Gen., Jerry Boone, Sol. Gen., New York City, of counsel), for defendant-appellee.

Before: KEARSE and WINTER, Circuit Judges, and CABRANES, District Judge.*

---

* The Honorable Jose A. Cabranes, Chief United States District Judge for the District of Connecticut, sitting by designation.

WINTER, Circuit Judge:

This appeal arises from Judge Hurley's denial of appellants' motion for a preliminary injunction. Appellants brought this class action (as yet not certified), seeking declaratory and injunctive relief against the implementation of a 1992 amendment to N.Y.Soc.Serv. Law § 367–a(6) (McKinney 1992), by the New York State Department of Social Services ("DSS"). The amendment requires recipients to make small cash payments for prescriptions and some medical services. Appellants sought, and were denied, a preliminary injunction against the implementation of this plan on the ground that it failed to guarantee that appellants will have meaningful access to mandated exemptions. We affirm.

## BACKGROUND

### A. *The Federal Statutory Scheme*

New York participates in the Medical Assistance Program ("Medicaid"), a joint federal-state program that provides comprehensive medical services to certain classes of indigent people. *See* 42 U.S.C. §§ 1396–1396u (1988 & West Supp.1993). DSS, of which appellee Mary Jo Bane is the Commissioner, administers Medicaid in New York. *See* N.Y.Soc.Serv.Law § 17 (McKinney 1992). As a condition for receiving federal matching funds, New York must comply with federal Medicaid statutes and regulations and must have a plan for medical assistance approved by the United States Department of Health and Human Services, Health Care Financing Administration ("HCFA"). *See* 42 U.S.C. § 1396 (1988).

The federal Medicaid law permits, but does not require, states to charge certain recipients "nominal" payments ("co-payments") for specific services. 42 U.S.C. § 1396o (b)(3); *see also* 42 C.F.R. § 447.54(a)(3) (1992) (defining "nominal"). The statute exempts from the co-payment requirements the following services and groups:

(1) persons under age 18 (or 21 at the state's option); (2) services furnished to pregnant women; (3) services furnished to recipients in a "hospital, nursing facility,

intermediate care facility for the mentally retarded, or other medical institution," if, under the state plan, the individual is required "as a condition of receiving services ... to spend for costs of medical care all but a minimal amount of his income required for personal needs"; (4) emergency services; and (5) hospice services. 42 U.S.C. § 1396o (b)(2). In addition, federal law requires that the state Medicaid plan ensure that no individual eligible for services be denied those services "on account of such individual's inability to pay" the co-payment. 42 U.S.C. § 1396o (e). To implement the inability-to-pay provision, federal regulations require that the state Medicaid plan specify a "basis for determining whether an individual is unable to pay the charge and the means by which such an individual will be identified to providers." 42 C.F.R. § 447.53(d)(4).

### B. *New York's Statutory Scheme*

In April 1992, New York amended Social Services Law Section 367–a(6)(a) to reduce payments to medical providers "by an amount not to exceed the maximum amount authorized by federal law and regulations as a co-payment amount, which co-payment amount the provider of such services may charge the recipient." N.Y.Soc.Serv.Law § 367–a(6)(a). The statute sets maximum charges for particular services, ranging generally from $.50 to $3.00, *see id.* § 367–a(6)(c), and sets an annual recipient cap of $100. *See id.* § 367–a(6)(f) (beginning April 1, 1993). The DSS established standard co-payments for services based on the average cost of the services. *See* N.Y.Comp.Codes R. & Regs. tit. 18, § 360–7.12(f)(2) (1992).

Only those services actually listed in Section 367–a(6)(d) are subject to co-payments. Pursuant to federal law, New York exempts certain services from co-payments, including services for emergencies, family planning, mental health, mental retardation, developmental disabilities, and substance abuse. *See* N.Y.Soc.Serv.Law § 367–a(6)(d). Psychotropic drugs and drugs for the treatment of tuberculosis are also exempted. *See id.*

§ 367–a(6)(d)(v). Also as required by the federal Medicaid statute, New York exempts certain persons from co-payments, including individuals under twenty-one years of age, pregnant women, residents of medical institutions, and persons enrolled in managed care programs, including health maintenance organizations ("HMOs"). *See id.* § 367–a(6)(b).

Even if the service or the recipient does not fall within an exemption, the recipient need not make the co-payment if unable to afford it. Section 367–a(6)(a) provides that "no provider may deny such services to an individual eligible for services based on the individual's inability to pay the co-payment amount." *Id.* § 367–a(6)(a). Section 367–a(6)(g)(i) also instructs the commissioner to "promulgate a regulation making it an unacceptable practice under the medical assistance program for a provider to deny services to an individual eligible for services based on the individual's inability to pay the co-pay amount." Finally, the statute requires DSS to establish and maintain a toll-free hotline for recipients to report violations of such regulations, *see id.* § 367–a(6)(g)(ii), and to "provide notice to all recipients summarizing their rights and obligations under this subdivision." *Id.* § 367–a(6)(g)(iii).

## C. *Implementation of the Co–Payment Scheme*

In May 1992, DSS mailed form letters to the approximately 1.2 million Medicaid households announcing that the co-payment requirement would begin on June 1, 1992. DSS also mailed a "Medicaid Update Bulletin" and form letter to pharmacists and to the approximately 76,000 Medicaid providers explaining how to collect the co-payments. Finally, DSS sent notices to local commissioners of DSS.

These materials instructed providers not to adjust their Medicaid claims to reflect co-payments because DSS will automatically reduce the provider's Medicaid reimbursement. The provider thus bears the burden of collecting the co-payment from recipients. In the case of an inability to pay, the reimbursement is nevertheless reduced. However, if the recipient or the services the recipient receives are otherwise exempt from co-payments, as identified by either the DSS computer or the provider's exemption claim form, the provider's reimbursement will not be reduced.

DSS promulgated a number of regulations and policies to identify recipients who do not have the ability to pay or who meet one of the statutory exemptions. With regard to the inability-to-pay provision, a simple statement by the recipient that he or she is unable to pay is sufficient. The provider may not contest the recipient's statement that he or she cannot pay. Moreover, it is an "unacceptable practice" for a provider to refuse to provide services after the recipient has expressed an inability to pay. *See id.* § 367–a(6)(g)(i); N.Y.Comp.Codes R. & Regs. tit. 18, §§ 360–7.12(a) & 515.2(17) (1992). A provider that has engaged in an "unacceptable practice" is subject to censure, monetary penalties, or termination from the Medicaid program. N.Y.Comp.Codes R. & Regs. tit. 18, §§ 515.1, 515.3 (1992).

With regard to the under–21 exemption, the recipient's date of birth is on his or her Medicaid card. Next, the DSS's Medicaid computer system (the Electronic Medicaid Eligibility Verification System ("EMEVS")) identifies recipients who are exempt because of their enrollment in managed care programs, Comprehensive Medicaid Case Management Programs, and Intermediate Care Facilities of the Developmentally Disabled. A recipient can request a hearing to challenge whether the date of birth is correct on the Medicaid card or whether he or she is in an HMO or managed care program.

Other methods of documentation are used for less permanent conditions. For example, pregnant women may demonstrate their eligibility for exemption in several ways—(1) by requesting a service that is pregnancy-related; (2) by a note from their doctor confirming pregnancy; (3) by their physical appearance; and (4) by any other method, including contact with the women's physician or by identifying a prescription/order source as a Prenatal Care Assistance Program. Similarly, to implement the exemption for residents in Office of Mental Retardation or Office of Mental Health ("OMR/OMH") Community

Residences, written documentation is provided to residents by the staff.

If a provider refuses services, the recipient may phone a toll-free hotline staffed by persons trained in the co-payment regulations and programs. Upon receiving a call, the staffer's first responsibility is to ensure that the recipient has received the needed care and, if not, to give instructions to go to another provider. The staffer then records all relevant information, such as the provider's name and date of the denial of service, and forwards a report to the DSS's Office of Audit and Quality Control, which conducts an investigation.

### D. *Procedural History*

Appellants filed this action on May 29, 1992 and moved for a temporary restraining order ("TRO") and preliminary injunction halting implementation of the program pending final disposition of the case. Judge Sifton[1] granted appellants' request for a ten-day TRO and ordered appellee to mail notices to all Medicaid providers directing them not to collect co-payments until further notice. Judge Hurley referred the application for a preliminary injunction to Magistrate Judge Caden, who commenced an evidentiary hearing on June 16, 1992. On July 9, Magistrate Judge Caden recommended the denial of the preliminary injunction on the ground that appellants had failed to establish irreparable harm.

All parties filed objections to the Magistrate Judge's Report and Recommendation. Appellants argued that the following facets of the co-payment program would deny recipients care: (1) the failure to notify participants that providers cannot question a recipient's declaration of the inability to pay; (2) the failure to implement procedures and enforcement mechanisms to reconcile the adverse interests of the providers and the recipients with respect to the inability-to-pay provision; and (3) the failure to promulgate proper procedures and notices to ensure that exempt individuals do not make the co-payments.

Judge Hurley agreed with the result of the Report and Recommendation and thus denied appellants' motion for a preliminary injunction. After reviewing the notices, Judge Hurley found that adequate notification was given regarding the inability-to-pay provision. Although he recognized that providers' and recipients' interests would sometimes be adverse because the provider would not be reimbursed for a co-payment that a recipient was unable to pay, he found that the state's enforcement mechanisms reasonably addressed this problem. Judge Hurley next held that because the burden of an erroneous requirement of a co-payment is financial, such an injury could be compensated by a refund, and thus there would be no irreparable harm by such a mistake. Finally, Judge Hurley noted that appellants' claim that some recipients will be deterred from seeking medical services or will misunderstand their rights is inevitable under any co-payment scheme.

Appellants appealed Judge Hurley's order and asked Judge Hurley for a stay pending the appeal. Judge Hurley declined to extend the stay pending appeal, but did extend the stay until August 28, 1992. Appellants then moved for a stay before this court. In response, DSS indicated its intent to issue revised notices of the co-payment program as part of the reimplementation of co-payments. We granted an interim stay on September 1, 1992. We required DSS to furnish counsel and the district court with the new notices prior to any mailing to providers and recipients, and ordered that the stay "last[ ] until the district court determines if the new notices are lawful and until such further time that the plaintiffs have had an opportunity to come back to this court to seek an extension of the Stay in the event the district court denies relief."

The new notices were provided to the district court on or about September 8, and DSS requested that the August order be modified to approve the notices. The new notices contain several improvements, including using upper case and bold face to explain the inability-to-pay provision and moving it to the first page of the notice. After appellants

---

1. Although the case was assigned to Judge Hurley, he was unavailable to hear the TRO motion.

had an opportunity to file objections, and appellee had an opportunity to reply, Judge Hurley held that the new notices were lawful.

Appellants filed a Notice of Appeal and moved to extend the interim stay and to consolidate the appeals of the two district court orders. We granted both motions, extending the stay until this expedited appeal could be heard. We now affirm.

## DISCUSSION

■■■ We review the district court's grant or denial of a preliminary injunction for an abuse of discretion. *See, e.g., Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991). A party seeking preliminary injunctive relief must establish: (a) irreparable harm and (b) either (i) a likelihood of success on the merits of the underlying claim or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant. *See, e.g., Eng v. Smith,* 849 F.2d 80, 81–82 (2d Cir.1988). Where, as here, a preliminary injunction "seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the less rigorous fair-ground-for-litigation standard should not be applied. *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989).

■■■ Appellants make numerous arguments attacking DSS's implementation of co-payments, but their arguments largely focus on problems that would inevitably attend any co-payment scheme. Congress's specific authorization of co-payments, however, strongly implies that a state need do no more than take reasonable steps to minimize such problems. Otherwise, a co-payment scheme could not be implemented as a practical matter. We believe, therefore, that appellants have not shown a likelihood of success on the merits.

### 1. *The Notices Adequately Explained the Co-payment Scheme*

Appellants argue first that the notices to recipients do not adequately explain the program. We disagree. The inability-to-pay provision is on the first page in upper case and bold face. The notice also states that a provider can ask for a co-payment "only for" the listed services. Appellants' expert stated the reading level of the recipient's letter to be a 12.2 grade level, but DSS introduced evidence of a computer analysis that pegged the grade level of the first notice at 8.58, and of the revised notice at 7.64. As the factfinder, Judge Hurley reviewed this evidence and found that the notices were sufficiently clear for recipients to understand them. Given the clear language of the notices, and the use of bold face and capital letters to highlight important points, we cannot hold that Judge Hurley's finding was clearly erroneous. *See* Fed.R.Civ.P. 52(a).

We also note that the federal authorization for a co-payment scheme with exemptions for various categories of individuals and services will inevitably require some degree of complexity in explanation. In the instant matter, DSS has probably attained as much simplicity as possible.

### 2. *The Procedures for Implementing the Co-payment Scheme are Sufficient*

Appellants next argue that the methods for identifying exempt groups are inadequate. Appellants concede that if a recipient's exempt status can be proved through his Medicaid Identification card (such as age), or in the EMEVS (such as enrollment in an HMO), that is a reasonable means of identifying exempt status that protects recipients' rights. However, appellants challenge exemptions identified in any other manner, including, *inter alia,* pregnancy, OMR/OMH community residents, and the inability-to-pay provision.

We first note that "substantial weight must be given to the good-faith judgments of the individuals charged ... with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of individuals." *Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976) (due process). Applying this standard, we must reject appellants' contentions.

Appellants argue that the procedures set out above to identify pregnant women are inadequate to alert pharmacists and care providers to their exempt status. However, where the nature of the care provided, appearance of the individual, or the type of drug prescribed is not an adequate identifier, DSS allows a note from the woman's doctor shown to pharmacists and other care providers to suffice. To insure flexibility, DSS has instructed providers that "other evidence" may be used, such as "telephone contact with a physician" or "when a prescription/order source is a Prenatal Care Assistance Program." DSS rejected as too burdensome a plan that would require a woman to bring to her local department caseworker proof that she was pregnant, who would then enter that information into the EMEVS. Given the requisite deference to social welfare administrators' "good-faith judgments," we have little difficulty concluding that these methods of identifying pregnant women's exempt status are a rational implementation of the co-payment scheme. *Mathews*, 424 U.S. at 349, 96 S.Ct. at 909.

Appellants next argue that the method of identifying OMR/OMH community residents is too burdensome. They argue that instead of requiring the staff to provide documentation to residents, the information should appear on the residents' Medicaid cards or in the EMEVS. However, after consulting with OMR/OMH staff, DSS concluded that staff-provided documentation would avoid the "lag time" in updating computer files and avoid problems arising from a high turnover rate of residents. Moreover, Michael Falzano, director of the bureau responsible for implementing the Medicaid program, stated in an affidavit that because of the mental and physical conditions of OMR/OMH residents, "it is likely that [Community Residence] staff will accompany residents to medical appointments." Again, we find that DSS reasonably designed the co-payment scheme to identify those recipients exempt because of their OMR/OMH residence status. We also note that providers are more likely to err on the side of finding an exemption because they will receive full reimbursement from Medicaid, rather than reimbursement reduced by the co-payment amount, which they must then attempt to collect from the patient.

Appellants' last such challenge is to the implementation of the inability-to-pay provision. Appellants argue that requiring recipients to assert to the provider that they cannot make the co-payment fails to establish adequate "means by which such an individual will be identified to providers." 42 C.F.R. § 447.53(d)(4). Appellants suggest adoption of a provision for a one-time determination that a recipient is unable to pay to be coded on the Medicaid card or the EMEVS. However, as appellee notes, this does not allow for changes in financial status. Moreover, DSS concluded that such a "means" test would be too burdensome on recipients, forcing them to produce income and expense documentation. Rather, DSS has simply made recipients' statements to providers that they are unable to pay sufficient. As noted above, a provider cannot contest such a statement. It is true that where the recipient is unable to pay, a provider has some incentive not to provide a service because it will not be reimbursed for the lost co-payment. However, the state has provided reasonable and adequate deterrence of such actions through penalties and has provided a convenient means through a toll-free hotline for recipients to report such denials.

Amicus MFY Legal Services, Inc., however, argues that none of these protections are adequate for mentally ill patients. We disagree. First, mentally ill patients whose conditions are severe will be protected by the OMR/OMH community residents' exemption set forth above. Second, most psychotropic drugs that are used to treat mental illness are exempt from co-payments. Moreover, the exemption does not require any action by recipients to avoid co-payments because the list of exempt drugs is provided to pharmacists. Although amicus seemingly seeks exempt status for the mentally ill, Congress made no such provision, and we are powerless to alter that decision.

3. *Appellants' Due Process Rights are Not Violated*

■ Finally, appellants argue that recipients have the right to individual notice of a

determination of their exempt status and the right to a hearing to challenge an adverse determination. Appellants conclude that the failure to give such notice and hearing prior to a reduction in benefits violated their due process rights.

We find no due process violation in this case. A hearing is provided upon request for recipients who believe that their date of birth is wrong on the Medicaid card or that there is an error as to whether they are in an HMO or managed care program. Those who cannot pay need only announce that fact and would not benefit from a hearing requirement. No hearing is provided if the recipient is denied exempt status on another statutory basis. However, due process does not provide that a statutory reduction in welfare benefits is permissible only after a state individually reviews its effect on every recipient. *Mathews,* 424 U.S. at 343, 96 S.Ct. at 907. DSS was thus not required to determine each individual's exempt status and then give notice of that status. The enormous burden of such a requirement would far outweigh any benefit. *See id.* at 349, 96 S.Ct. at 909.

## CONCLUSION

We have reviewed appellants' other arguments and find them without merit. The stay is lifted.

Affirmed.