Krasaundra **WARD, Akilah Bittle, Denise Miller, Yecenia Rivera** and **Philomena Collins, individually and on behalf of others similarly situated,**

v.

Joyce **THOMAS, Commissioner, Connecticut Department of Social Services,**

v.

Donna **SHALALA, Secretary, United States Department of Health and Human Services.**

Civ. No. 3–95–cv–1284 (JBA).

United States District Court, D. Connecticut.

July 31, 1995.

tion of 1995 Conn.Acts 95–194, *as amended by* 1995 Conn.Acts 95–351 (to be codified at Conn.Gen.Stat. 17b–104) ("the Act"), which took effect July 1, 1995.

The challenge focuses on the manner in which defendant intends to compute plaintiffs' AFDC benefits by attributing to them a portion of their housing subsidies as unearned income. Specifically, plaintiffs assert that the defendant fails to meet the requirements of the federal law, 42 U.S.C. § 602(a)(7)(C)(ii), that permits states to consider housing subsidies as income and specifies the manner in which such income attribution may be done.

The unchallenged portion of the Act also reduces monthly AFDC benefits immediately to AFDC families by eliminating the $50 monthly "special needs" allowance to AFDC households paying more than 50% of their income on housing and by reducing monthly benefit payment levels across the board to all AFDC families by approximately 7%, to approximately 73% of the established subsistence level for Connecticut.

The plaintiffs filed suit on June 28, 1995 seeking a Temporary Restraining Order on the basis that defendant's notice to them of these impending benefit cutbacks was untimely and inadequate under federal law in its description of the forthcoming impact on them and of their fair hearing rights (under 45 C.F.R. § 205.10(a)(4) (1994)) and the Fourteenth Amendment of the U.S. Constitution. The defendant answered and impleaded the Secretary of Health and Human Services (HHS) as a Third Party defendant seeking declaratory relief to avoid the possibility of being subject to inconsistent directives.

Following a hearing on the Application for a Temporary Restraining Order on June 29, 1995, the court found the defendant's notice deficient and entered an order restraining defendant from reducing benefits to AFDC families without first providing the requisite timely and adequate notice. (*Ruling on Plaintiffs' Motion for Temporary Restraining Order*, 895 F.Supp. 401, dated June 30, 1995).

Kathleen Sullivan, the Jerome N. Frank Legal Services Organization, Shelley White, New Haven Legal Assistance, New Haven, CT, and Shirley Bergert, Connecticut Legal Services, Inc., Willimantic, CT, for plaintiffs.

Hugh Barber, Richard Lynch, Peter Brown, Atty. General's Office, Hartford, CT, for Joyce Thomas.

John Hughes, U.S. Attorneys' Office, New Haven, CT, for Donna Shalala.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

ARTERTON, District Judge.

The plaintiff class of more than 50,000 persons who are heads of households of families receiving Aid to Families With Dependent Children ("AFDC") in Connecticut have brought this civil rights action claiming that the defendant Joyce Thomas, Commissioner of the Department of Social Services, has failed to fulfill her federal statutory obligations in connection with her implementa-

The defendant has since issued a ten-page informational packet to all AFDC families concerning the statutory changes (Defendant's Exhibit Y; DSS, Informational Packet), and has sent individual notices with respect to the benefit reductions for August 1995 (e.g., Defendant's Exhibits Z1–Z5). Based on these remedial issuances, the plaintiffs no longer challenge the adequacy and timeliness of defendant's notice related to the welfare cutbacks generally.

At issue here in plaintiffs' Motion for Preliminary Injunction is the challenge of the subclass of AFDC families who reside in government subsidized housing and who are now about to be subjected to the additional reduction in their monthly benefit payment as a result of a portion of their housing subsidy now being imputed to them as income. As these families are considered to have increased income, their benefits payments will be reduced correspondingly. With the across-the-board unchallenged reduction and the housing subsidy reduction, a family of four with no other income will receive $558/month, which is a $288 cutback, and $16 per month less than such a family would have received in 1988 if they had no income. The plaintiff subclass's challenge is three-pronged: (1) the defendant's methodology for computing the value of their housing subsidy *for the purpose of imputing countable income to them conflicts with federal law*; (2) the defendant's reduction of their AFDC benefits prior to receiving approval by the Secretary of HHS for these AFDC plan amendments violates federal law; and, (3) the defendant's authority to impose benefit payment levels which are below the May 1988 level requires a prior waiver from the Secretary of HHS under 42 U.S.C. § 1396a(c).

Defendant has moved to dismiss the plaintiffs' claim under 42 U.S.C. § 1396a(c) as lacking a right of enforceability under 42 U.S.C. § 1983, *inter alia*. Both parties agree that the standards of *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) will apply to the

analysis in light of the "*Suter* Amendment," 42 U.S.C. § 1320a–2. Because the court concludes that plaintiffs have not shown a likelihood of success on the merits of this aspect of their claim, a decision on the question of whether § 1396a(c) creates rights enforceable under § 1983 will be reserved until decision on defendant's pending Motion to Dismiss.

A hearing was held on July 19 and 24, 1995 on these issues. The parties submitted a Joint Statement of Uncontested Facts which they agreed would be an adequate factual basis for the court's ruling. Based on the briefing by the parties, oral argument and the uncontested facts, plaintiffs' Motion for Preliminary Injunction will be granted with respect to the defendant's intended valuation of the "housing subsidy" received by public housing residents *for the reasons that follow*. Plaintiffs' Motion will be denied in all other respects.

## BACKGROUND

■ AFDC is a joint federal and state program established under Title IV–A of the Social Security Act, 42 U.S.C. § 601 *et seq.*, that provides cash assistance to needy families.[1] Under this program, states receive federal matching funds if they have a state AFDC plan that comports fully with the Social Security Act. The statutes which create this "scheme of cooperative federalism" give states "considerable latitude" in the administration of their programs. *King v. Smith*, 392 U.S. 309, 316–19, 88 S.Ct. 2128, 2133–34, 20 L.Ed.2d 1118 (1968).

An eligible family's benefit is a percentage of a calculation called the "Standard of Need", a minimum amount deemed necessary to maintain a hypothetical family at a level of subsistence. A state is free to determine what percentage of this Standard of Need it will provide as AFDC benefits, however, state Medicaid plans are not federally approvable by the Secretary of Health and Human Services ("HHS") unless AFDC ben-

---

1. AFDC has been characterized by one commentator as "the central pillar of the American public assistance system. It is the largest cash assistance program and the one on which intense and conflicting popular attitudes towards welfare tend to focus." William H. Simon, "Legality, Bureaucracy and Class in the Welfare System," 92 *Yale L.J.*, 1198, 1201 (1982–83).

efits are at levels at least in effect in May 1988 under 42 U.S.C. § 1396a(c) unless the Secretary formally waives such requirement pursuant to 42 U.S.C. § 1315.

The genesis of this challenge by AFDC residents who live in subsidized housing is an apparently infrequently used federal statute which permits state agencies to impute to AFDC recipients as unearned but 'countable' income:

> ... the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income.

42 U.S.C.A. § 602(a)(7)(C)(ii) (West Supp. 1995).

The legislative history on 42 U.S.C. § 602(a)(7) does not offer much guidance on how to value the housing subsidies. The Congressional intent expressed was to encourage states to consider the availability of other types of benefits which AFDC recipients may receive and thus "mitigate the effects of pyramiding benefits." S.Rep. 97–139 (1981) *reprinted in* 1981 U.S.C.C.A.N. 396, 770. Interestingly, it appears that even the Secretary of HHS is uncertain as to how to value certain housing subsidies for AFDC purposes:

> There are various HUD programs which provide subsidies to benefit renters and buyers. Our agency is working with HUD to identify which programs are involved, how they operate and some ideas on how subsidies could be valued. We will publish an Action Transmittal in the near future.

47 Fed.Reg. 5648, 5653 (1982).

Neither party, nor the court's independent research, indicates that the Secretary has ever published the promised transmittal to date.

The new state Act attempts to utilize this federal provision as follows:

> Effective July 1, 1995, for a family living in subsidized housing, eight per cent of the standard of need, which represents the value of the subsidized housing, shall be counted as income in determining the benefit payment. Such benefit payment shall be reduced by eight per cent of the payment standard.

1995 Conn.Acts 95–194, *as amended by* 1995 Conn.Acts 95–351, § 2(d).

The defendant Commissioner's policies and procedures which have been developed during the pendency of this litigation appear to be an effort to conform implementation of this Act to federal statutory and regulatory requirements. Under federal law, a state cannot value this subsidized housing in excess of "the value of any rent or housing subsidy provided to such family." 42 U.S.C.A. § 602(a)(7)(C)(ii) (West Supp.1995). Further, a housing subsidy can be counted as income only "to the extent [it] duplicates" the shelter allocation in the basic monthly benefit payment. *Id.* In flat grant states like Connecticut, "shelter" is not separately allocated. Defendant has now amended the state's AFDC plan to reflect this shelter allocation, based on historical data. Plaintiffs do not dispute this calculation or methodology at this time.

Defendant has now established a policy articulating the need to account for families' *actual* housing subsidies to ensure that benefits are not improperly reduced:

> Revised Policy: In order to ensure that the Department does not count more than the actual amount of the government subsidy as income, revised policy provides that the amount of the subsidy to be counted is the lower of eight percent of the Standard of Need for the appropriate size of the assistance unit, or the *actual amount of the housing subsidy.*

(Defendant's Exhibit EE; DSS Policy Transmittal, No. UP–95–17) (emphasis added).

The parties agree that such actual subsidies received could, in fact, be less than the statutory valuation of such subsidy (8% of the Standard of Need), and therefore actual subsidies must be valued. Plaintiffs challenge the defendant's manner and basis for computing this actual housing subsidy to impute countable income as conflicting with federal law and Due Process principles.

## CLASS CERTIFICATION

The court conditionally certified the plaintiff class under Rule 23(a) and (b)(2) in its Ruling on Plaintiffs' Motion for Temporary Restraining Order, and the parties have now stipulated that such conditional class certification is appropriate based on the Amended Complaint filed July 25, 1995.

Because defendant may decide to assert a claim for recoupment of "over payments" paid in compliance with the court's order enjoining reduction of July benefits, defendant postulates that the representative plaintiffs may not adequately protect the interests of the class. Apart from the merits of this objection, as defense counsel concedes, it is premature since the defendant has not yet decided whether or not she will attempt to recoup those court-ordered benefits. Accordingly, the class is defined as all current AFDC recipients subject to AFDC grant reductions pursuant to Public Act 95–194, as amended by Public Act 95–351, and all caretaker relatives of AFDC children subject to such grant reductions effective July 1, 1995, with a subclass of all such plaintiffs who reside in subsidized housing. In light of the truncated injunctive relief ordered in this decision, this subclass of subsidized housing residents will be certified as a subclass composed of two parts: 1) subsidized housing residents receiving direct rental subsidies under the federal Section 8 housing program and state Rental Assistance Program subsidies, and 2) subsidized housing residents in public housing who receive no individually identifiable rental subsidy attributable to their respective unit.[2]

The members of the plaintiff subclass receive a variety of subsidized housing assistance. One part of the subclass receives subsidies from the various federal Section 8 Housing programs, 42 U.S.C. § 1437f and the state Rental Assistance Program (RAP), Conn.Gen.Stat. § 17b–812. In these pro-grams, tenants live in housing owned and operated by a private landlord but their rent is limited to a percentage of their monthly income. *See* 42 U.S.C.A. § 1437a (West Supp.1995) (federal low-income housing programs). The state Department of Housing, with funds from the federal government for its programs, pays the landlord the difference between the tenant's rental payment and the contract rent on the lease. It is clear from the tenant's lease the respective contributions of the tenant and the government to the total monthly rent.

Other members of the plaintiff subclass live in federal low-income housing, moderate rental housing and housing for low-income persons in public housing which is operated by instruments of local governments known as public housing authorities ("PHA"). Each public housing complex is built with tax-exempt bonds issued by a local PHA. The federal Department of Housing and Urban Development (HUD) pays the annual debt service on these bonds until they are retired and title to the properties is then transferred to the local PHA. *See* 42 U.S.C.A. 1437b(a) (West Supp.1995).

Tenant rents in public housing are also based on percentage of monthly income. At one time these rents were sufficient to cover the expenses of the PHAs, but now HUD must provide operating subsidies to most PHAs. *See* 42 U.S.C.A. § 1437g (West Supp.1995). HUD provides these subsidies to PHAs by project and does not calculate the value on a unit-by-unit basis. Unlike Section 8 leases, no value of the government's subsidy to the unit itself is stated on a tenant's lease for public housing, and thus, public housing tenants do not readily have this information.

## PRELIMINARY INJUNCTION

 A preliminary injunction "is an extraordinary and drastic remedy which should

---

**2.** Anne C. Clark has moved to intervene as a party plaintiff under Fed.R.Civ.P. 24. Ms. Clark is an AFDC recipient residing in a state-assisted moderate rental housing project operated by the Housing Authority of the City of Willimantic, Connecticut. Ms. Clark alleges that neither she nor the complex where she resides receives a housing subsidy, but the defendant is attributing $48.56 as income to her as a housing subsidy. She moves to intervene because no other named plaintiff occupies a unit in public housing and receives public housing. Recognizing the similarity of Ms. Clark's claims to the other plaintiffs and Ms. Clark's intention to file a separate action if she is not made a party plaintiff, the court grants Anne Clark's motion to intervene.

not be routinely granted." *Medical Soc. of the State of N.Y. v. Toia,* 560 F.2d 535, 537 (2d Cir.1977). The standard within this Circuit for granting such a remedy requires the movant to show a risk of irreparable harm and either (a) a likelihood of success on the merits or (b) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships decidedly favoring the party requesting the relief. *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir.1995) *(quoting Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991)).

▮ Where, as in this case, the moving party seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the movant must meet the more rigorous standard of likelihood of success on the merits. *Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993) *(quoting Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)).[3] "This exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. U.S.,* 44 F.3d 128, 130 (2d Cir.1995).

▮ An irreparable injury is one that is "actual and imminent" not "remote or speculative," *State of N.Y. v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir.1977), and cannot be redressed through a monetary award. *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). The movant must demonstrate that irreparable harm is likely, not merely possible. *Id.*

As explained in the court Ruling on Plaintiffs' Motion for Temporary Injunction, courts have consistently found that reductions in welfare benefits, even by small amounts, constitute irreparable harm. *Beno v. Shalala,* 30 F.3d 1057, 1063 n. 10 (9th Cir.1994). *See e.g. Banks v. Trainor,* 525 F.2d 837 (7th Cir.1975); *Gorrie v. Heckler,* 606 F.Supp. 368 (D.Minn.1985); *Moore v. Miller,* 579 F.Supp. 1188 (N.D.Ill.1983); *Nelson v. Likins,* 389 F.Supp. 1234 (D.Minn. 1974).

Any decrease in benefits for individuals living in the "grip of poverty," such as AFDC recipients, potentially deprives them of the ability to obtain essentials such as food, clothing and housing. *Moore v. Miller,* 579 F.Supp. at 1191. The stipulated chart summarizing the benefits reductions under the Act, attached to plaintiffs Amended Complaint, and the named plaintiffs' affidavits, clearly demonstrate how financially precarious they are and how vulnerable they are to any decrease in their subsistence benefit levels. The defendant offers no evidence or argument in opposition.[4] Accordingly, the court finds that plaintiffs have demonstrated irreparable harm.

In determining whether the plaintiffs have shown the requisite likelihood of success on the merits, there are three issues which require analysis:

(1) Must the defendant Commissioner await amended state AFDC plan approval

---

**3.** Plaintiffs argue that this higher standard should not apply because as members of the public, the government's action is certainly not in their interest. In *Haitian Centers Council v. McNary,* 969 F.2d 1326 (2nd Cir.1992) *vacated as moot* — U.S. ——, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), the Immigration and Naturalization Service (INS) pursuant to an executive order acted to prevent Haitian aliens from entering the United States. The Second Circuit found that neither the INS nor the Haitian aliens had an "exclusive claim on the public interest." *Id.* at 1339. Where a government agency acts pursuant to a more generalized grant of power such as an executive order, a court may apply the lower "sufficiently serious questions" standard. *Toy Mfrs. of America Inc. v. Blumenthal,* 806 F.Supp. 336, 340 n. 3 (D.Conn.1992) *aff'd on other grounds* 986 F.2d 615 (2nd Cir.1992). *See Hai-*

*tian Centers Council,* 969 F.2d at 1339. In the instant case, however, the defendants are acting pursuant to a statutory scheme and thus, the court will apply the "likelihood of the merits" standard irrespective of the plaintiffs' public interest claims. *See Sweeney v. Bane,* 996 F.2d 1384 (2nd Cir.1993) ("fair-ground-for-litigation" standard not applicable where New York State enforced revised state Medicaid statute).

**4.** The defendant has made no showing of hardship to the Department other than that she could be required to maintain certain AFDC benefit levels for the plaintiffs, or subclass, pending final decision in this case. Certainly the balance of hardships decidedly tips towards the plaintiffs if relief were denied.

by the Secretary of HHS before reducing benefits for recipients receiving housing subsidies?

(2) Does the reduction in benefit payments resulting from imputing housing subsidies as income cause the plaintiffs' benefits payments to fall below the May 1988 levels, thus requiring a waiver of the maintenance-of-effort provisions, 42 U.S.C. § 1396a(c), prior to implementation of the reductions?

(3) Does the defendant's policy and procedure for valuing housing subsidy received to be counted as "income" conflict with 42 U.S.C. § 602(a)(7)(C)(ii), 45 C.F.R. § 233.20(a)(3)(xii) or other federal law?

### a. Approval Requirements For Amended State AFDC Plan

Plaintiffs maintain that federal law prohibits the state from implementing these changes in its state AFDC plan before the Secretary of HHS approves it. They ask this court to enjoin implementation of the amended plan containing the changes required under the state Act until such federal approval is obtained. They maintain that the implementing regulations require a state which chooses to count the value of the governmental rent or subsidies as income to have in effect a state plan that meets certain requirements: [5]

... the State plan shall (A) [i]dentify the amount for shelter included in its need and payment standards for an assistance unit of the same size and composition (States which have a flat grant system must estimate this amount based on historical data or some other justifiable procedure); and (B) [s]pecify the amount of such housing assistance that it will count as income. Under this requirement the amount of such rent or housing subsidies which a State may count as income may not exceed the amount for shelter established in its

payment standard for assistance unit of the same size and composition.

45 C.F.R. § 233.20(a)(3)(xii) (1994).

Defendant maintains that no prior approval of an AFDC amended plan is required under statute or regulation before implementation. Indeed, the language of 45 C.F.R. § 201.3(g) appears to contemplate that an effective plan date may be earlier than the date the plan is submitted to the Secretary for approval. *See Illinois Council on Long Term Care v. Miller*, 579 F.Supp. 1140, 1145 (N.D.Ill.1983) (where the court found that the language of 45 C.F.R. § 201.3(g) indicates a willingness to allow implementation of programs without prior approval). 45 C.F.R. § 201.3(g) (1994) states the following:

The effective date of a new plan may not be earlier than the first day of the calendar quarter in which an approvable plan is submitted, and with respect to expenditures for assistance under such plan, may not be earlier than the first day on which the plan is in operation on a statewide basis. The same applies with respect to plan amendments that provide additional assistance or services to persons eligible under the approved plan or that make new groups eligible for assistance or services provided under the approved plan. For other plan amendments the effective date shall be as specified in other sections of this chapter.

45 C.F.R. § 201.3(g) (1994).

There is, of course, something of a tautology here where defendant contends that it may implement an "approvable" amended AFDC plan prior to obtaining Secretary's approval, i.e., one that conforms to the federal statutes and regulations and where plaintiffs challenge the *approvability*, i.e., the amended plan's violation of federal statutes and regulations. This circularity is somewhat resolved by the Court's analysis of the merits of plaintiffs' Motion for a Preliminary Injunction.

---

**5.** When this action was filed, defendant had no state plan which either identified the shelter amount in the flat grant, nor any specification as to the amount of such housing assistance she would count as income, other than the Act's 8%

of standard of need valuation. The state plan has now been retroactively amended to reflect the shelter amounts and how various housing subsidies are to be valued to be counted as income.

Plaintiffs' original claim was that there was no state plan in existence on effective date of Act July 1, 1995—either in terms of shelter allocation in flat grant or specification regarding amount of housing assistance to be counted as income. The amended plan submitted after the Act's effective date (Defendant's Exhibit F) retroactively cured these claimed deficiencies and plaintiffs' remaining challenge relates to whether defendant must have an "approved" or an "approvable" plan before she can implement the welfare benefit reductions.

Defendant cites to *Jennings v. Alexander*, 715 F.2d 1036 (6th Cir.1983), *rev'd on other grounds sub nom., Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Charleston Memorial Hosp. v. Conrad*, 693 F.2d 324 (4th Cir., 1982); and, *Washington State Health Facilities, Ass'n v. State of Wash., Dept. of Social and Health Services*, 879 F.2d 677 (9th Cir.1989), in support of her argument that approval by the Secretary is not required prior to implementation of the plan amendments.

In *Jennings v. Alexander, supra,* the court held that the State was not required to obtain prior approval from the Secretary of Health and Human Services before implementing a reduction in the number of hospital days covered by Medicaid from twenty to fourteen per annum. The court, looking to the language of 42 U.S.C. § 1396c, found that "[t]his standard clearly contemplates the adoption of changes in the original plan without prior approval from the Secretary." *Id.* at 1045.

42 U.S.C. § 1396c provides:

If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—

1) that the plan has been so changed that it no longer complies with the provisions of section 1396a ...; or

2) that in the administration of the plan there is a failure to comply substantially with any such provision;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply.

The Court of Appeals, quoting the language from the district court's decision in *Jennings v. Alexander,* 518 F.Supp. 877, 888 (M.D.Tenn.1981), held that while "Congress could easily have provided that no state plan could be modified without prior approval of the Secretary, [it] instead authorized the Secretary to invoke sanctions when modifications were found to be out of compliance with the statute." *Jennings,* 715 F.2d at 1046.

Similarly, in *Charleston Memorial Hospital v. Conrad,* 693 F.2d 324 (4th Cir., 1982), the court found that § 1396c does not expressly provide that a plan may not be amended without prior approval by the Secretary.

In *Washington State Health Facilities v. DSHS,* 879 F.2d 677 (9th Cir.1989), the Secretary approved an amendment to the Washington State Medicaid Plan and designated its effective date as the first day of the calendar quarter in which it was submitted even though the Secretary, subsequent to the amended plan's submission, had sought clarification from the state regarding the plan amendments. The court held that the Secretary's determination of the effective date was not arbitrary, capricious or an abuse of discretion and that the fact that clarification was sought "would not prevent a plan whose basic elements were sound from being considered 'approvable' when submitted." *Id.* at 682.

A provision similar to § 1396c relating to deviation from approved AFDC plans, is set forth in 42 U.S.C. § 604(a) which states:

In the case of any State plan for aid and services to needy families with children which has been approved by the Secretary, if the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of such plan, finds—

(1) that the plan has been so changed as to impose any residence requirement prohibited by section 602(b) of this title, or that in the administration of the plan any such prohibited requirement is imposed, with the knowledge of such State agency, in a substantial number of cases; or

(2) that in the administration of the plan there is a failure to comply substantially with any provision required by section 602 of this title to be included in the plan;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure) until the Secretary is satisfied that such prohibited requirement is no longer so imposed, and that there is no longer any such failure to comply.

■ Applying the principles of *Jennings, Charleston,* and *Washington State,* the court finds that the language of § 604 does not require prior approval of the Secretary before implementation of a plan amendment to an already approved AFDC plan. Thus, the plaintiffs are unlikely to prevail on the merits of this claim, and their Motion for Preliminary Injunction on this basis will be denied.

*b. Effect of Lowered Benefit Payments on Federal Maintenance-of-Efforts Requirements Under 42 U.S.C. § 1396a(c)(ii)*

Plaintiffs also seek to enjoin defendant's implementation of benefit reductions under the Act because the result is benefit payment levels for AFDC families living in subsidized housing below those in effect in May 1988, allegedly in violation of the federal "maintenance-of-effort" requirement. 42 U.S.C. § 1396a(c). The maintenance-of-effort requirement was part of the Medicare Catastrophic Coverage Act of 1988 and states:

Notwithstanding subsection (b), the Secretary shall not approve any State Plan for medical assistance if (1) the State has in effect, under its plan established under part A of Title IV, payment levels that are less than the payment levels in effect under such plan on May 1, 1988.

42 U.S.C.A. § 1396a(c)(1) (West Supp.1995).

The parties agree that, as a result of the defendant's recalculation of benefits under the Act, subsidized housing plaintiffs may well receive a lower monthly benefit check than their May 1988 payment levels. (See Amended Complaint—Payment Levels Chart). The parties disagree as to whether that result gives rise to a plan whose reduced AFDC "payment levels" are unapprovably reduced.

Plaintiffs argue that because benefit levels of plaintiffs living in subsidizing housing will be less than May 1988 payment levels, the defendant is not implementing an approvable AFDC plan and must be enjoined. Plaintiffs ask the court to examine the legislative history of the state Act to conclude that the state legislature intended to reduce benefit levels, not to attribute income.

Defendant correctly maintains that the federal court cannot review what the state legislative intent may have been in passing the Act or whether the Commissioner has properly interpreted or implemented the underlying state Act. Under the principles of *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), this Court limits its review to whether the defendant Commissioner's policies and procedures implementing the state Act are in conflict with federal or constitutional requirements. *See Blum v. Bacon,* 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) (invalidating New York State AFDC provision under the Supremacy Clause).

The defendant argues that under the Commissioner's application of the state statute, the maintenance-of-effort levels are measured with reference to AFDC recipients with *no* income, such that plaintiffs, now with *imputed income,* are no longer measurable at those levels. Moreover, defendant reasons, the resulting lower monthly AFDC check is the result of the change in the defendant's methodology for counting income, not a benefit level reduction like the 7% across-the-board benefit reduction simultaneously being implemented. Understand-

ably from the plaintiffs' viewpoint, this is a distinction without a difference.

The court finds, however, that from the record presented thus far, plaintiffs have not demonstrated a likelihood of showing conflict with federal law in this regard. Congress clearly permitted states to use this "income" attribution methodology:

A state plan for aid and services to needy families with dependent children must—

(7) provide that the State agency—

(C) may, in the case of a family claiming or receiving aid under this part for any month, take into consideration as income (to the extent the State determines appropriate, as specified in such plan, and notwithstanding any other provision of law)—

(ii) any amount not to exceed the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income.

42 U.S.C.A. § 602(a)(7)(C)(ii) (West Supp. 1995).

The Secretary of HHS, through the Director of Administration for Children and Families has issued an Information Memorandum ACF–1M–92–8 (dated 8/5/92) (Defendant's Exhibit L), which explains how state changes in AFDC needs standards and payment levels would be measured against the May 1988 maintenance-of-effort yardstick under 45 C.F.R. § 233.20(a)(2)(ii). The Director, recognizing that the term "payment levels" was not statutorily defined nor generally used in the AFDC program, defined payment levels as "the amounts of the payments for basic needs (according to family size) which would be made to families with no income under the approved State AFDC plan." (Defendant's Exhibit L.) Recognizing that changes in state AFDC needs standards or other plan change may result in reduced payments to recipients the Director advised:

Only the AFDC payment made to a family with no income other than AFDC will be considered when determining if AFDC payment levels have been reduced. AFDC payment levels will be considered reduced if a change in the approved AFDC State plan results in a lower AFDC payment for basic needs to a family of the same size and composition with no income.

*Id.*

■ While this interpretation does not expressly address the state plan change permitted under 42 U.S.C. § 602(a)(7) to attribute duplicative housing funds as "income", the defendant's interpretation appears reasonable and not in apparent conflict with 42 U.S.C. § 1396a(c) notwithstanding the fact that it will certainly have the same impact on plaintiffs. For this reason, plaintiffs have not demonstrated that they are likely to prevail on the merits of this claim.

### c. Defendant's Policy and Procedure for Valuing Housing Subsidies

The defendant's policies and procedures for implementing 42 U.S.C. § 602(a)(7) to reduce the benefits for the subclass of plaintiffs in subsidized housing, like plaintiffs' challenges, have been something of a "work in progress" during the pendency of this litigation. The defendant's original policy for implementing the Act's across-the-board valuation of subsidized housing (Defendant's Exhibit E; HSS Policy Transmittal UP 95–13) was amended to protect against erroneous benefit reductions by clarifying that the actual government subsidy must be counted in the determination of benefits if it is less than 8% of the standard of need. (Defendant's Exhibit EE, *supra.*)

On July 24, 1995, the defendant again revised her Department's policy to articulate a methodology for determining this *actual* amount of a family's housing subsidy, so the revised policy of accurately imputing income could be accomplished. (Defendant's Exhibit Z–6; HSS Policy Transmittal UP 95–20).

As to plaintiff class members receiving Section 8 or RAP housing, the methodology is clear and straightforward:

The amount of the housing subsidy is the monthly amount paid to the landlord on behalf of the tenant, which represents the

difference between the contract rent and the rent paid by the tenant.

*Id.*

As previously described, accurate figures of the housing subsidy received by each such tenant are readily ascertainable by reference to the tenant's individual lease which specifies how much of the rent is paid by the plaintiff and how much by subsidy. A plaintiff may determine whether his or her *actual* subsidy is less than the defendant's computation of 8% of the standard of need, and may seek and prosecute a fair hearing on that basis.

Plaintiffs fault this policy as applied to AFDC families in subsidized housing who pay more in rent than the total of both the shelter component amount and the housing subsidy provided, and claim that in such cases the subsidy should not be deemed "duplicative" and should not be imputed as income. This reading, as defendant asserts, is inconsistent with the statute's language and purpose which permits housing subsidies which *duplicate* shelter allocations in basic AFDC benefits payments grants, to be counted as income, without regard to how much the AFDC family actually *pays* in rent, to take account of a "pyramiding benefits." *See* S.Rep. 97–139 (1981), *reprinted in* 1981 U.S.C.C.A.N. 770. Thus, the court concludes that defendant's methodology for valuing housing subsidies or income attribution to plaintiffs in Section 8 and RAP rental subsidy programs does not conflict with federal law.

In contrast, however, the court concludes that the defendant's methodology regarding valuation of housing subsidies claimed to be received by public housing residents is shown likely to violate 42 U.S.C. § 602(a)(7)(c)(ii) and 45 C.F.R. § 233.20(a)(3)(xii) because defendant has no basis for objectively and equitably imputing income to plaintiffs in public housing since her department lacks the data necessary to specify the "amount of such housing assistance that it will count as income" other than the Act's flat 8% valuation; and (2) because defendant's policy of requiring the plaintiffs themselves to compile the financial data necessary to apply defendant's formula to determine whether their "actual housing subsidy" is less than the 8% statutory valuation, places on the individual AFDC recipient an impermissible burden.

The defendant's labyrinthian methodology for computing the actual "housing subsidy" as countable income for public housing tenants in federally-assisted low-income housing and state-assisted low and moderate-income rental housing is as follows:

*Federal Low–Income Housing*

The annual subsidy for each unit is determined by dividing the total operating subsidy by the total number of bedrooms in the complex and multiplying this by the number of the bedrooms in the particular unit. This is divided by twelve to get the monthly subsidy.

*Moderate Rental Housing*

The amount of the subsidy for this type of housing depends on the annual payment in lieu of taxes (PILOT), the difference between the market interest rate and the actual interest rate of the low interest loans received to construct the housing and the value of any other financial assistance received. The subsidy for each unit is determined by dividing the annual PILOT plus the annualized value of loan interest rate subsidy and any other financial assistance received, by the total number of bedrooms in the complex. This is multiplied by the number of the bedrooms in the particular unit. The product is divided by twelve to get the monthly subsidy.

*Housing for Low Income Persons*

The amount of the subsidy for this type of housing depends on the value of financial assistance received from the state in the form of grants or deferred loans by the authority. The subsidy for each unit is determined by dividing the value of the annualized financial assistance received by the total number of bedrooms in the complex. This is multiplied by the number of the bedrooms in the particular unit. The product is divided by twelve to get the monthly subsidy.

(Defendant's Exhibit Z–6, *supra.*)

The parties and the court know of no other court which has addressed the issues of

whether and how a "housing subsidy" may be attributed to AFDC families in public housing under this federal law where there is no individualized subsidy to them by housing unit as in Section 8 or RAP housing. Plaintiffs suggest that it is precisely the impossibility of doing so that explains why so very few states have ever attempted any income attribution methodology for public housing residents. They also argue that the language of 42 U.S.C. § 602(a)(7) referencing housing subsidies "provided to such family" necessarily precludes a finding of any such attributable subsidy for public housing residents since they receive no direct subsidy and the amount of any *operating* subsidy bears no relationship to a determinable "fair market value" for their units.

Defendant introduced excerpts from Nevada's amended AFDC plan as demonstrative of an HHS approved state AFDC plan under 42 U.S.C. § 602(a)(7) in which $76 of the recipients' housing subsidy is counted as income "or if the value of the subsidy is less, the lower amount is counted." (Defendant's Exhibit Z–7; Nevada State Plan, Section 2.3 and attachments). However, this exhibit does not demonstrate the use of any methodology for determining the actual *public housing* subsidy. Defendant also asserts that the Department is "generally aware" that the value of the housing subsidies received by residents in public housing far exceeds the amount counted as income. (Defendant's Memorandum in Opposition to the Motion for Preliminary Injunction at p. 13.) However, defendant failed to offer any evidence or testimony to substantiate this assertion.[6]

At the preliminary injunction hearing, defendant's counsel conceded that defendant does not now have the financial data on federal operating subsidies, payment-in-lieu-of-taxes (PILOT) payments, market interest rates, low interest loan rates received for construction, annualized value of loan inter-est rate subsidies, grants or loan deferrals and/or other financial assistance received by the various municipal housing authorities where the plaintiffs live, which is called for under defendant's formula to determine the actual subsidy claimed to be received by public housing plaintiffs before countable income can accurately be imputed to this plaintiff subclass as a basis for reducing their benefit payments. In short, as to public housing residents, defendant is currently unable to implement her own policy of ensuring that the Department does not count more than the actual amount of the government subsidy as income. The defendant's current policy is:

*Procedures*

Workers should ask for verification of the Section 8 or RAP subsidy only when the client states the value of the subsidy is less than the amount counted by the Department.

Workers do not have to obtain verification of the housing subsidy for other types of subsidized housing. The amounts will be determined by Central Office and issued through another Transmittal.

(Defendant's Exhibit Z–6, *supra*).

Since defendant's policy does not require Department workers to obtain this information, and she does not have it, defendant is left necessarily in the position of reducing benefits on the basis of the Act's blanket 8% valuation, unless the AFDC recipients themselves come up with this documentation to show that their benefits are being reduced unlawfully.

Plaintiffs maintain that this is an undue burden to require AFDC families to provide the Department with such information regarding the value of their subsidy, because unlike tenants in the Section 8 and RAP programs, this information is not on their leases.[7] Defendant responds that plaintiffs

6. In fact, defendant had subpoenaed Mr. Robert Donovan, a HUD official, to obtain the federal operating subsidy information. On motion by the federal government, Mr. Donovan was released from this subpoena because defendant has failed to meet the requirements for subpoenas for federal officials under 24 C.F.R. § 15.72 (1994). Mr. Donovan has agreed to provide defendant with the relevant financial documents upon clarification of her request.

7. Plaintiffs state that: "... class member Marilyn Mooney, who live in state-assisted moderate rental housing for which she pays $400 is placed by defendant's eleventh-hour 'clarifying' regulation in the catch 22 position of having to estab-

may obtain this information through a Freedom of Information Act ("FOIA") request under 5 U.S.C. § 552 or Conn.Gen.Stat. § 1–19,[8] and that it is plaintiffs' burden to gather it under the principles of *Lavine v. Milne,* 424 U.S. 577, 96 S.Ct. 1010, 47 L.Ed.2d 249 (1976).[9] Defendant adds that, in any event, she will be obtaining the various components of the "subsidy" computation for these public housing programs, will be making a calculation for the AFDC public housing residents whether or not plaintiffs request a fair hearing, and will rebate to them in the future any erroneously withheld benefits. However, this potential for erroneous reduction of benefit payments is precisely the irreparable harm plaintiffs seek to avoid by their Motion for Preliminary Injunction. Moreover, in the absence of defendant also maintaining public housing recipients' benefits at the pre-July 1, 1995 levels until she makes these determinations, plaintiffs will still be deprived of rights under 45 C.F.R. § 205.10.

The court concludes that placing the burden on AFDC recipients to timely obtain through FOIA requests, or otherwise, a housing authority's operating costs, rent rolls, complex's number of bedrooms, annual PILOT payments, market interest rates and lower than market interest rates on applicable construction loans, other state grants or deferred loans, and/or "the value of any other financial assistance received" by each housing authority, for the purpose of being able to even claim a fair hearing under 45 C.F.R. § 205.10 exceeds any proof burden contemplated by 42 U.S.C. § 602(a)(7). Furthermore, it is highly likely that such burden of

proof will effectively nullify plaintiffs' opportunity to be heard in such fair hearing. As the Supreme Court recognized, "the opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly,* 397 U.S. 254, 268–69, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970). Simply put, if defendant has not had the capacity to obtain such information, plaintiffs are certainly in no superior circumstance to do so.

 The court recognizes as settled principle that welfare benefits may be denied to non-cooperative applicants who refuse to provide necessary information. *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); *Lavine v. Milne, supra.* The burden of proof on the recipient in showing eligibility for welfare benefits is particularly appropriate "where the knowledge is solely with the recipient." *Gandy v. Blum,* 108 Misc.2d 895, 439 N.Y.S.2d 65, 67 (N.Y.Sup. 1980) (burden on applicant to disclose assets). *See also Synesael v. Ling,* 691 F.2d 1213 (7th Cir.1982), *cert. denied,* 462 U.S. 1121, 103 S.Ct. 3092, 77 L.Ed.2d 1352 (1983) (presumption on Medicaid applicant regarding transfer of assets below market value); *Tillman v. Fahey,* 73 A.D.2d 980, 423 N.Y.S.2d 556 (1980), *aff'd,* 53 N.Y.2d 815, 439 N.Y.S.2d 921, 422 N.E.2d 581 (1981) (burden on welfare applicant to establish good cause for missing work placement appointment); *Schanbarger v. N.Y. State Com'r. of Social Services,* 109 A.D.2d 1037, 487 N.Y.S.2d 156 (1985) (wel-

---

lish the value of a subsidy that she doesn't even receive in order to establish that she should not have any income attributed to her as the value of that alleged subsidy." (Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, p. 14.)

**8.** It does not appear from a review of 5 U.S.C. § 552 or Conn.Gen.Stat. § 1–19 that there exist any time limitations as to when a public agency must provide public records to individuals upon request. Under 24 C.F.R. § 15.42 (1995), regarding disclosure of public records by employees of the Department of Housing and Urban Development, the local office must generally determine within ten days receipt of a request for records, whether to comply with such request. That time limitation can be extended in "unusual

circumstances" such as searching voluminous records or records from other field facilities. Under Conn.Gen.Stat. § 1–21i, an individual denied access to inspect public records may appeal to the freedom of information commission within thirty days of the denial of access.

**9.** In *Lavine,* the Court found it to be a permissible presumption under New York state law that applicants who apply for welfare benefits within 75 days after voluntarily leaving their jobs were deemed to have quit for the purpose of qualifying for benefits. In reaching this conclusion, the Court found that such presumption "merely makes absolutely clear the fact that the applicant bears the burden of proof on this issue as it does all others." *Id.* at 424 U.S. at 584, 96 S.Ct. at 1015.

**420**

fare applicant has burden to demonstrate residency).

 This does not mean, however, that defendant can impose on AFDC recipients an impossible burden of producing information. As a Three–Judge District Court in Connecticut found, in setting aside a Connecticut "transfer-of-assets" welfare rule:

> ... [I]t does not follow that a state may impose unlimited burdens of proof upon welfare applicants, especially where an applicant has cooperated fully in good faith and *is not in a position to do more.*

*Buckner v. Maher,* 424 F.Supp. 366, 373 (D.Conn.1976), *aff'd,* 434 U.S. 898, 98 S.Ct. 290, 54 L.Ed.2d 184 (1977) (citations omitted) (emphasis added). Moreover, based on the same reasoning of the court as to the existence of irreparable harm to AFDC recipients from even numerically small erroneous benefit cutbacks, the defendant's panacea offered of retroactive rebates to rectify defendant's errors arising from the absence of information to apply her policy, is inadequate. *See RAM v. Blum,* 533 F.Supp. 933, 940 (S.D.N.Y.1982).

The court finds therefore that the proof burden placed on AFDC families in public housing to claim and exercise their fair hearing rights regarding computation of their housing subsidy is contrary to federal standards under 45 C.F.R. § 205.10(a). The court further finds that defendant is unable at this time to determine the actual value of the public housing subsidy necessary to calculate the reduction in benefit payments. Without this determination, defendant is unable to comply with 42 U.S.C. § 602(a)(7). Further, reducing benefits without actual subsidy calculations constitutes making determinations on need and amount of assistance without adequate basis, and is contrary to the state's obligations to make such determinations on an "objective and equitable" basis under 45 C.F.R. § 233.20(a).

Accordingly, the subclass of public housing plaintiffs have demonstrated their likelihood of success on the merits of their claim that defendant's manner of reducing their benefits violates federal law and that they are entitled to preliminary injunctive relief.

At this time, the court cannot address plaintiffs' remaining claim that defendant's formulae itself for calculating public housing tenants' actual housing subsidy conflicts with 42 U.S.C. § 602. Unless and until the actual application of this policy can be examined, a judicial determination of these novel and difficult issues is premature.

### CONCLUSION

Based on the foregoing, plaintiffs' motion for preliminary injunction is GRANTED in part and defendant is enjoined from attributing housing subsidies as income to AFDC recipients who live in public housing and accordingly shall not reduce their benefits on this basis until further order of this Court. Defendant may seek to dissolve this injunction at such time as she is prepared to demonstrate the objective and equitable basis for her policy.

IT IS SO ORDERED.